## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| SA PALM BEACH LLC, on behalf of itself and all others similarly situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON, and UNDERWRITERS AT LLOYD'S LONDON KNOWN AS SYNDICATES CNP 4444, AFB 2623, AFB 623, BRT 2987, BRT 2988, NEO 2468, SAM 727, AXS1686, XIS H4202, QBE 1886, DUW 1729, WBC 5886, CHN 2015, HDU 382, MSP 318, AGR 3268, APL 1969, ACS 1856, AMA 1200, TAL 1183 and PPP 9981, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff SA Palm Beach LLC ("Plaintiff"), by way of Complaint against Defendants Certain Underwriters at Lloyd's London ("Lloyd's) and Underwriters at Lloyd's London known as Syndicates CNP 4444, AFB 2623, AFB 623, BRT 2987, BRT 2988, NEO 2468, SAM 727, AXS1686, XIS H4202, QBE 1886, DUW 1729, WBC 5886, CHN 2015, HDU 382, MSP 318, AGR 3268, APL 1969, ACS 1856, AMA 1200, TAL 1183 and PPP 9981 (together "Defendants"), alleges as follows:

## INTRODUCTION

1.     On March 11, 2020, World Health Organization ("WHO") Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels

of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

2.     On March 16, 2020, the Centers for Disease Control and Prevention ("CDC"), and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19.  This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than ten people, and staying away from bars, restaurants, and food courts.[2]

3.     Following this advice for individuals to adopt far-reaching social distancing measures, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human-to-human and surface-to-human spread of COVID-19.  As a result, many governmental entities entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals.  Currently, almost all states within the United States have issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

4.     The result of these far-reaching restrictions and prohibitions has been catastrophic for most non-essential businesses, especially restaurants and other foodservice businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who

---

[1]     *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

[2]     https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

5.     Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies.  These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property.  This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

6.     Defendants, and most insurance companies who have issued all-risk commercial property insurance policies with business interruption coverage, are denying the obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by the civil authorities to stop the spread of COVID-19 among the population.  This action seeks a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop the spread of the outbreak triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendants are liable for the losses suffered by policyholders.

7.     In addition, this action brings a claim against Defendants for their breach of their contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiff and others similarly situated for business losses and extra expenses, and related losses

resulting from actions taken by civil authorities to stop the human-to-human and surface-to-human spread of the COVID-19 outbreak.

8.      Plaintiff brings this action on behalf of a proposed class of policyholders who paid premiums in exchange for an all-risk commercial property insurance Policy that included lost business income and extra expense coverage.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) in that this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of one of the Defendants.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that Defendants do business in this District and thus reside in this District, in accordance with 28 U.S.C. §1391(c).

## PARTIES

11.     Plaintiff SA Palm Beach LLC is a New York limited liability company which operates a restaurant operating under the name Sant Ambroeus Palm Beach at 340 Royal Poinciana Way, Suite 304, Palm Beach, Florida ("SA Palm Beach").

12.     Defendants issued to SA Palm Beach Policy no. PXA0001184-00 covering the policy period December 12, 2019 through December 12, 2020.  Plaintiff's Policy, as well as the Policies of other Class members, are standard forms that are used by Lloyd's for all insureds having applicable coverage and provide identical or substantially similar coverage for all Class members.

13.     Defendant Lloyd's is composed of syndicates of individual underwriters that share respective and several liability under the Policy.

14.     The liabilities under the Policy are shared among a syndicate of 21 underwriters identified by a initials and syndicate number, and respective allocation of liability: Syndicates CNP 4444 (6%) , AFB 2623 (4.92%), AFB 623 (1.08%), BRT 2987 (11.25%), BRT 2988 (1.25%), NEO 2468 (14%), SAM 727 (1.5%), AXS1686 (7.5%), XIS H4202 (2.5%), QBE 1886 (10%), DUW 1729 (5%), WBC 5886 (4.5%), CHN 2015 (2.75%), HDU 382 (1.5%), MSP 318 (3%), AGR 3268 (4%), APL 1969 (4%), ACS 1856 (5%), AMA 1200 (2%), TAL 1183 (1.5%) and PPP 9981 (1%)

## FACTUAL BACKGROUND

### A.     The Global COVID-19 Pandemic

15.     Viruses of the family Coronaviridae, such as Middle East respiratory syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome (SARS) coronavirus (SARS-CoV), have been responsible for the loss of human life since at least 2002 and were identified in several animal hosts.[3]

16.     In December 2019, an initial cluster of nine patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market in Wuhan, China, where many non-aquatic animals such as birds were also on sale.  However, one of the patients never visited the market, though he had stayed in a hotel nearby before the onset of the illness.[4]

---

[3]     *See*   https://www.cdc.gov/coronavirus/2019-ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf (There are four genera of CoVs: (I) α-coronavirus (alphaCoV), (II) β-coronavirus (betaCoV) probably present in bats and rodents, while (III) δ-coronavirus (deltaCoV), and (IV) γ-coronavirus (gammaCoV) probably represent avian species)

[4]     *See* https://www.mdpi.com/1660-4601/17/8/2690 (As a typical RNA virus, the average evolutionary rate for coronaviruses is roughly 10–nucleotide substitutions per site per year, with mutations arising during every replication cycle.  This finding suggests that 2019-nCoV originated from one source within a short period and was detected rapidly.  However, as the virus transmits to more individuals, constant surveillance of mutations arising is needed.)  *See* Lu R, Zhao X, Li J, et al., *Genomic characterisation and epidemiology of 2019 novel coronavirus: implications for virus origins and receptor binding*, LANCET (London, England) 2020 Feb.; 395(10224):565-574.

17.     By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[5]  SARS-CoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope.  Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[6]

18.     The first confirmed case of the virus outside China was diagnosed on January 13, 2020 in Bangkok, Thailand with the number of cases exceedingly increasing worldwide.  On January 30, 2020, WHO declared the SARS-COv-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the virus was named "COVID-19" by the WHO Director-General.[7]  As of April 15, 2020, the WHO reported a confirmed 1.9 million cases of COVID-19 globally and over 123,000 deaths, with the United States dealing with more than 578,000 confirmed cases and 23,000 deaths - more than any other country.[8]

19.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit ("ICU").  Pneumonia has been the most frequent severe manifestation of COVID-19, with

---

DOI: 10.1016/s0140-6736(20)30251-8.   (This finding suggests either possible droplet transmission or that the patient was infected by a currently unknown source.  Evidence of clusters of infected family members and medical workers has now confirmed the presence of human-to-human transmission.)

[5]      https://www.mdpi.com/1660-4601/17/8/2690

[6]      *See*  https://www.mdpi.com/1660-4601/17/8/2690   (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered.  Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes—30–32 kb—with a 50 -cap structure and 30 -poly-A tail.)

[7]      https://www.mdpi.com/1660-4601/17/8/2690

[8]      https://covid19.who.int/

symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[9]   There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[10]

20.     It has now been discovered by scientists that COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, presymptomatic transmission, or asymptomatic transmission.[11]   Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual.  Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[12]

---

[9]     *See*  https://www.mdpi.com/1660-4601/17/8/2690 (Asymptomatic infections have also been described, but their frequency is unknown.  Other, less common symptoms have included headaches, sore throat, and rhinorrhea.  Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients they may be the presenting complaint.)

[10]     *See*  https://www.mdpi.com/1660-4601/17/8/2690 (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection.  Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock.  Different strategies can be used depending on the severity of the patient and local epidemiology.  Home management is appropriate for asymptomatic or paucisymtomatic patients.  They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days.  Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.)

[11]     https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2

[12]     *See*   https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in upper respiratory tract (nose and throat) early in the course of the disease.  That is, within the first three days from onset of symptoms.  Preliminary data suggests

21.     The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.[13]  During this period, also known as the "presymptomatic" period, some infected persons can be contagious.  For that reason, transmission from a presymptomatic case can occur before symptom onset.  Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[14]

22.     An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the virus to another.  Though there are few documented cases reported, it does not exclude the possibility that it has or may occur.[15]

23.     Not only is COVID-19 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces. According to a study by scientists documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel.[16]  All of these

---

that people may be more contagious around the time of symptom onset as compared to later on in the disease.)

[13]     https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2

[14]     *See*     https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (In a small number of case reports and studies, presymptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases.  This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms.  Thus, it is possible that people infected with COVID-19 could transmit the virus before significant symptoms develop.)

[15]     https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2

[16]     *See*   https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces;

materials are used in the preparation and service of food by restaurants.  The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic.

24.     Another scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV can remain infectious on inanimate surfaces at room temperature for up to nine days.[17]  At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter.  Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[18]  Though this study was not conclusive on COVID-19 itself, scientists are still grappling to understand this implication.

25.     On March 27, 2020, the CDC released a report entitled "*Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020.*"[19]  The report detailed that during this time frame, COVID-19 outbreaks associated with three different cruise

---

*See*      https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations.  (In the context of COVID-19, airborne transmission may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; *i.e.*, endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator, non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.)

[17]     *See*   https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3

[18]     *See*   https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation it seem plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate patient surrounding where the highest viral load can be expected.  The WHO recommends "to ensure that environmental cleaning and disinfection procedures are followed consistently and correctly.")

[19]     https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w

ship voyages caused over 800 confirmed cases and ten deaths.[20]  Of the individuals tested, a high proportion were found to be asymptomatic, which may explain the high rates on cruise ships.  What is interesting about this study though, is that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[21]  The CDC notes that more studies are required to understand the perpetuation of transmission, but what is clear is the uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, most significantly, food service businesses

---

[20]    *See*   https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w. (During February 7–23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3 (*3*).  On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined.  By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages.  On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons aged ≥65 years.  On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States.  CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.)

[21]    *See*   https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w (Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine.  On the Grand Princess, crew members were likely infected on voyage A and then transmitted SARS-CoV-2 to passengers on voyage B.  The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms.  A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew.  Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of SARS-CoV-2 aboard cruise ships is warranted.)

26.     Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human-to-human and surface-to-human exposure. Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[22] Various other sources state that close contact with a person with the virus or surfaces where the virus is found can transmit the virus.[23]

27.     The secondary exposure of the surface-to-humans is particularly acute in places where the public gathers typically to socialize, eat, drink, shop, be entertained, and go for recreation.  This is why the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside.  However, because these recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing non-essential business establishments, including restaurants, bars, hotels, theaters, personal care salons, gyms, and schools, and mandating social distancing among the population.  This has caused the cancelation of sporting events, parades, and concerts, the closure of amusement parks, and substantial travel restrictions.  In addition, to conserve medical supplies, orders have been issued prohibiting the performance of non-urgent or non-

---

[22]     https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html

[23]     Kemp, G., et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. HOSPITAL INFECTION, Vol. 104, No. 3 (Mar. 2020), pp. 246-251 (remains infectious from two hours to 28 days depending on conditions); *see also* https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (doorknobs and table tops can contain the virus); https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal, glass, and plastic for several days).

emergency elective procedures and surgeries, forcing the suspension of operations at many medical, surgical, therapeutic, and dental practices.

28.     In Florida, Governor DeSantis has issued a series of Executive Orders relating to coronavirus protection. On March 1, 2020, he issued Executive Order 20-51 directing the State Health Officer and Surgeon General to declare a public health emergency. On March 9, 2020, he issued Executive Order 20-52 declaring a state of emergency in Florida as a result of COVID-19. On March 17, 2020, he issued Executive Order 20-68, which provided that restaurants were to operate at 50% capacity, maintain 6-foot distances between parties, and prohibit any employees from working if they exhibited any listed symptoms of COVID-19. On March 20, 2020, he issued Executive Order 20-70, which ordered all bars and food-serving establishments in Broward and Palm Beach Counties closed except for delivery and take-out service (the "Closure Order"). Executive Order 20-71, issued the same day, imposed a similar restriction on restaurants state-wide in Florida. On March 30, 2020, by way of Executive Order 20-89, Gov. DeSantis closed all non-essential businesses in Palm Beach County in accordance with guidelines previously established by Miami-Dade County. On April 1, 2020, he issued Executive Order 20-91, which directed that all persons in the State of Florida stay at home except for trips relating to essential services.

**B.      Defendants' Standard Uniform All-Risk Commercial Property Insurance Policies**

29.     Defendants' insurance policies issued to Plaintiff and the Class members are "all risk" commercial property polices which cover loss or damage to the covered premises resulting from all risks other than those expressly excluded.

30.     Plaintiff's Policy, as well as the policies of other Class members, are standard forms that are used by Lloyd's for all insureds having applicable coverage.

C.     **Plaintiff's Factual Allegations**

31.     Among the coverages provided by the Policy was business interruption insurance, which, generally, would indemnify Plaintiff for lost income and profits in the event that its business was shut down.

32.     The Business Income (And Extra Expense) Coverage Form, CP 00 30 04 02, in Plaintiff's Policy provides:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

33.     The Business Income (And Extra Expense) Coverage Form defines Business Income as:

    a.     Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

    b.     Continuing normal operating expenses incurred, including payroll.

34.     The Business Income (And Extra Expense) Coverage Form further provides:

**Extra Expense**

    a.     Extra Expense coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income coverage applies at that premises.

    b.     Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss. We will pay Extra Expense (other than the expense to repair or replace property) to:

        (1)     Avoid or minimize the "suspension" of business and to continue operations at the described premises or at

replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

(2)     Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

35.     The Business Income (And Extra Expense) Coverage Form further provides:

**Additional Coverages**

    **a.     Civil Authority**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for Extra Expense will begin immediately after the time of that action and will end:

(1)     3 consecutive weeks after the time of that action; or

(2)     When your Business Income coverage ends;

whichever is later.

36.     Covered Cause of Loss is defined under the Policy in a separate form, Causes of

Loss – Special Form, Form 10 30 10 12.

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

37.     The Policy contains an endorsement entitled GAC-CP-007 (09/07) Total Mold,

Mildew or Other Fungi Exclusion, which provides:

We do not cover loss, damage, cost, fine, penalty or expense caused directly or indirectly by, arising out of, in connection with, resulting from, contributed to or related in any way by exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

The term "organic pathogen" or "organic pathogens" means any organic irritant or contaminant including but not limited to the following: mold, fungus, bacteria, or virus including but not limited to their byproducts such as mycotoxins, mildew, or biogenic aerosol.  "Organic pathogen" includes but is not limited to the following fungi or mycotoxins produced by such fungi: Aspergillus, Penicillium, Stachybotrys chartarum, Trichodema, and Fusarium Memnoniella.

This exclusion also applies to any claim arising out of allegations of acts or omissions by or on behalf of the insured in connection with exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens. There shall be no obligation to defend the insured against any claim or loss excluded by this endorsement regardless of whether the allegations forming the basis of the claim or loss are groundless, false, or fraudulent.

This exclusion includes but is not limited to (1) any cost, expense or charge to test, monitor, cleanup, remediate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any way respond to or assess the effects of mold, mildew, mycotoxins, fungi or organic pathogen; or (2) any cost, expense or charge in connection with the actual or alleged discharge, dispersal, seepage, migration, release, escape, exposure to, manifestation, appearance, presence, or growth of mold, mildew, mycotoxins, fungi or organic pathogens.

38.     Plaintiff and all similarly situated Class members have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

39.     The exclusion contained in the Mold, Mildew or Other Fungi Exclusion endorsement is not applicable because Plaintiff's and other Class members' losses were not caused directly or indirectly by any of the actions set forth in the endorsement.  Rather, the efficient proximate cause of Plaintiff's and other Class members' losses were precautionary measures taken

by the State of Florida to prevent the spread of COVID-19 in the future, not because coronavirus was found in or on Plaintiff's insured property.

**D.**     **The COVID-19 Pandemic has Affected Policyholders Nationwide**.

40.     COVID-19 is physically impacting private commercial property in Florida and throughout the United States, threatening the survival of thousands of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

41.     All but six states have enacted "stay-at-home" orders, 35 states have closed all non-essential businesses with other states enacting measures to curtail business operations, all 50 states have closed schools, and all but one state has closed restaurants and bars for services other than take-out and delivery.[24]

42.     No insurer intends to cover any losses caused by the COVID-19 pandemic.

43.     For example, a bipartisan group from the U.S. House of Representatives recently sent a letter to various insurance industry trade groups requesting that their members recognize financial losses relating to COVID-19 under the standard commercial interruption coverage.  In response, the industry trade groups stated: "Business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19."[25] Upon information and belief, Lloyd's belongs to and supports the trade groups' position.

44.     In addition, many state departments of insurance have issued advisories to business owners that COVID-19 is not an insured peril and there will be no coverage for business

---

[24]     https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

[25]     https://www.insurancejournal.com/news/national/2020/03/20/561810.htm

interruption.  This is disinformation being published to discourage business owners from filing claims.

45.     For instance, Arkansas Insurance Department Bulletin No. 9-2020 states that "In most BII policies, coverage is triggered when the policyholder sustains **physical damage to insured property** caused by a covered peril resulting in quantifiable business interruption loss . . . [v]iruses and disease are typically NOT an insured peril <u>unless added by endorsement.</u>" (Emphasis in the original).[26]

46.     The South Carolina Department of Insurance issues "Guidance" on business interruption insurance stating that under the business income policy, there likely is no coverage from losses resulting from a virus.[27]

47.     Members of the insurance industry have also been actively advising Insurance Commissioners that they do not intend to provide coverage for business interruption related to COVID-19.  As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses because the insurance industry is stating that such policies do not cover COVID-19.

48.     For instance, the State of Connecticut Insurance Department, Maryland Insurance Administration, and the West Virginia Office of the Insurance Commissioner issued nearly identical notices supporting the insurance companies' reasons for denying business interruption claims, stating that the potential loss costs from such perils [like COVID-19] are so extreme that providing coverage would jeopardize the financial solvency of property insurers.[28]

---

[26]     https://insurance.arkansas.gov/uploads/resource/documents/9-2020.pdf

[27]     https://www.doi.sc.gov/948/COVID-19

[28]     *See* https://portal.ct.gov/CID/Coronavirus/Business-Interruption-Insurance-Notice;

49.     John F. King, Insurance and Safety Fire Commission for the State of Georgia issued Bulletin 20-EX-3 stating that losses from COVID-19 are excluded losses.[29] Vicki Schmidt, Kansas Insurance Department Commission issued a similar Bulletin stating it was her "understanding that it is unlikely that a business policy would cover losses related to COVID-19[.]"[30]

50.     Other state governments expect that insurance companies will breach their obligation to provide coverage for business losses due to the COVID-19 pandemic and have introduced bills requiring every insurance policy insuring against loss or damage to property, which includes the loss of use and occupancy and business interruption, be construed to include, among other covered perils, coverage for business interruption because of global virus transmission or pandemic.[31]

51.     A declaratory judgment determining that the business income loss and extra expense coverage provided in common all-risk commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent the Plaintiff and similarly situated Class members from being denied critical coverage for which they have paid.

---

https://insurance.maryland.gov/Pages/newscenter/NewsDetails.aspx?NR=2020256; https://www.wvinsurance.gov/Portals/0/pdf/pressrelease/20-08%20Business%20Interruption%20Insurance.pdf?ver=2020-03-26-222830-620.

[29]     https://www.oci.ga.gov/ExternalResources/Announcements/Bulletin-3172020-1619.pdf.

[30]     https://insurance.ks.gov/documents/department/COVID19-FAQ.pdf.

[31]     *See* House Bill No. 858, State of Louisiana House of Representatives.  Similar legislation has been introduced in Massachusetts (Senate Bill Senate Docket No. 2888); New Jersey (Assembly No. 3844); Sate of New York (Assembly 10226); and Ohio (House Bill No. 589).

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and

(b)(3) on behalf of themselves and all other persons similarly situated.

53.     The Nationwide Class is defined as:

> All entities who have entered into standard all-risk commercial property
> insurance policies with Lloyd's, where such policies provide for business
> income loss and extra expense coverage and do not exclude coverage for
> pandemics, and who have suffered losses due to measures put in place by
> civil authorities to stop the spread of COVID-19.

The Florida Sub-Class is defined as:

> All entities who have entered into standard all-risk commercial property
> insurance policies with Lloyd's to insure property in Florida, where such
> policies provide for business income loss and extra expense coverage and
> do not exclude coverage for pandemics, and who have suffered losses due
> to measures put in place by civil authorities to stop the spread of COVID-
> 19.

Excluded from each class are the Defendants, their employees, officers, directors, legal

representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies;

Class Counsel and their employees; and the judicial officers and their immediate family members

and associated court staff assigned to this case.

54.     Plaintiff reserves the right to modify, expand, or amend the definitions of the

proposed classes following the discovery period and before the Court determines whether class

certification is appropriate.

55.     Certification of Plaintiff's claims for class-wide treatment is appropriate because

Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as

would prove those elements in individual actions alleging the same claims.

**Numerosity**

56.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The Class

numbers at least in the hundreds and consists of geographically dispersed business entities who

are insured for business interruption losses.  Lloyd's sells many insurance policies in the State of

Florida and most, if not all, other states and therefore joinder of the Class members is

impracticable.

57.     The identity of Class members is ascertainable, as the names and addresses of all

Class members can be identified in Lloyd's or their agent's books and records.  Plaintiff anticipates

providing appropriate notice to the certified Class in compliance with Fed. R. Civ. P. 23(c)(2)(A)

and/or (B), to be approved by the Court after class certification, or pursuant to court order under

Fed. R. Civ. P. 23(d).

**Typicality**

58.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's

claims are typical of the claims of each of the Class members, as all Class members were and are

similarly affected and their claims arise from the same all-risk commercial property insurance

policy provisions entered into with Lloyd's.  Each Class member's insurance policy contains the

same form providing coverage for business income loss.  None of the forms exclude coverage due

to a governmental action intended to reduce the effect of the ongoing global pandemic.  As a result,

a declaratory judgment as to the rights and obligations under Plaintiff's Policy will address the

rights and obligations of all Class members.

**Adequacy of Representation**

59.     Plaintiff is committed to prosecuting the action, will fairly and adequately protect

the interests of the members of the Class, and has retained counsel competent and experienced in

class action litigation, including litigation relating to insurance policies. Plaintiff has no interests antagonistic to or in conflict with other members of the Class. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

**Commonality**

60.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact that are common to each of the classes. These common questions predominate over any questions affecting only individual Class members. The questions of law and fact common to the Class include, but are not limited to:

a.    Whether there is an actual controversy between Plaintiff and Lloyd's as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all-risk commercial property insurance policies;

b.    Whether measures to reduce the spread of the COVID-19 pandemic are excluded from Plaintiff's and the Class members' standard all-risk commercial property insurance policies;

c.    Whether the measures put in place by civil authorities to stop the spread of COVID-19 caused physical loss or damage to covered commercial property;

d.    Whether Lloyd's has repudiated and anticipatorily breached the all-risk commercial property insurance policies it issued with business interruption coverage by intending to deny claims for coverage; and

e.    Whether Plaintiff and the Class members suffered damages as a result of the anticipatory breach by Lloyd's.

**Superiority/Predominance**

61.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with Lloyd's.

62.     Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions.   The burden imposed on the judicial system by individual litigation, and to Lloyd's, by even a small fraction of the Class members, would be enormous.

63.     In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member.   The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation.   Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).   Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

64.     Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.   Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.   The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

## COUNT I

### DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE
**(Claim Brought on Behalf of the National Class and Florida Subclass)**

65.     Plaintiff repeats the allegations set forth in paragraphs 1-64 as if fully set forth herein.

66.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Florida Subclass.

67.     Plaintiff's Lloyd's Policy, as well as those of the other Class members, are contracts under which Lloyd's was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policy.

68.     Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Lloyd's or Lloyd's is estopped from asserting them, and yet Lloyd's has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

69.     Lloyd's has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

70.     An actual case or controversy exists regarding Plaintiff's and the other Class members' rights and Lloyd's obligations under the Policies to reimburse Plaintiff and Class members for the full amount of Business Income losses incurred by Plaintiff and the other Class members in connection with the suspension of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

71.     Pursuant to 28 U.S.C. §2201, Plaintiff and the other Class members seek a declaratory judgment from this Court declaring the following:

    a.   Plaintiff's and the other Class members' Business Income losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

    b.   Lloyd's is obligated to pay Plaintiff and other Class members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Order during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

## COUNT II

**BREACH OF CONTRACT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the National Class and Florida Subclass)**

72.     Plaintiff repeats the allegations set forth in paragraphs 1-71 as if fully set forth herein.

73.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Florida Subclass.

74.     Plaintiff's Lloyd's Policy, as well as those of the other Class members, are contracts under which Lloyd's was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policy.

75.     In the Business Income (And Extra Expense) Coverage Form, Lloyd's agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

76.     In the Business Income (And Extra Expense) Coverage Form, Lloyd's agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage.  A "partial slowdown or complete cessation" of business activities at the Covered Property is a

"suspension" under the Policy, for which Lloyd's agreed to pay for loss of Business Income during the "period of restoration" "that occurs within 24 consecutive months after the date of direct physical loss or damage."

77.    "Business Income" under the Policy means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred", as well as "[c]ontinuing normal operating expenses incurred, including payroll".

78.    The Closure Order caused direct physical loss and damage to Plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties.  Losses caused by the Closure Order thus triggered the Business Income provision of Plaintiff's and the other Class members' Lloyd's policies.

79.    Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Lloyd's or Lloyd's is estopped from asserting them, and yet Lloyd's has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

80.    By denying coverage for any Business Income losses incurred by Plaintiff and other Class members as a result of the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Lloyd's has breached its coverage obligations under the Policies.

81.    As a result of Lloyd's breaches of the Policies, Plaintiff and the other Class members have sustained substantial damages for which Lloyd's is liable, in an amount to be established at trial.

## COUNT III

### DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE
### (Claim Brought on Behalf of the National Class and Florida Subclass)

82.     Plaintiff repeats the allegations set forth in paragraphs 1-81 as if fully set forth herein.

83.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Florida Subclass.

84.     Plaintiff's Lloyd's Policy, as well as those of the other Class members, are contracts under which Lloyd's was paid premiums in exchange for its promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

85.     Plaintiff and Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Lloyd's or Lloyd's is estopped from asserting them, and yet Lloyd's has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

86.     Lloyd's has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

87.     An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Lloyd's obligations under the Policies to reimburse Plaintiff and other Class members for the full amount of covered Civil Authority losses incurred by Plaintiff and other Class members in connection with Closure Order and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

88.     Pursuant to 28 U.S.C. §2201, Plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

    a.   Plaintiff's and other Class members' Civil Authority losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

    b.   Lloyd's is obligated to pay Plaintiff and other Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Order and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

## <u>COUNT IV</u>

### BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE
### (Claim Brought on Behalf of the National Class and Florida Subclass)

89.     Plaintiff repeats the allegations set forth in paragraphs 1-88 as if fully set forth herein.

90.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Florida Subclass.

91.     Plaintiff's Policy, as well as those of the other Class members, are contracts under which Lloyd's was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policy.

92.     Lloyd's Business Income (And Extra Expense) Coverage Form provides "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss."

93.     The Closure Order triggered the Civil Authority provision under Plaintiff's and the other members of the Class' Lloyd's Policies.

94.     Plaintiff and the other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Lloyd's or Lloyd's is estopped from asserting them, and yet Lloyd's has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

95.     By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Lloyd's has breached its coverage obligations under the Policies.

96.     As a result of Lloyd's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Lloyd's is liable, in an amount to be established at trial.

<u>COUNT V</u>

**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the National Class and Florida Subclass)**

97.     Plaintiff repeats the allegations set forth in paragraphs 1-96 as if fully set forth herein.

98.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and the Florida subclass.

99.     Plaintiff's Lloyd's Policy, as well as those of other Class members, are contracts under which Lloyd's was paid premiums in exchange for its promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

100.     Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Lloyd's or Lloyd's is estopped from asserting them, and yet Lloyd's has abrogated its insurance coverage obligations pursuant to the

Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

101.    Lloyd's has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

102.    An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Lloyd's obligations under the Policies to reimburse Plaintiff and the other Class members for the full amount of Extra Expense losses incurred by Plaintiff and Class members in connection with Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

103.    Pursuant to 28 U.S.C. §2201, Plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

> a.    Plaintiff's and other Class members' Extra Expense losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and
>
> b.    Lloyd's is obligated to pay Plaintiff and other Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Order during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

<u>**COUNT VI**</u>

**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the National Class and Florida Subclass)**

104.    Plaintiff repeats the allegations set forth in paragraphs 1-103 as if fully set forth herein.

105.    Plaintiff brings this Count individually and on behalf of the other members of the National Class and Florida Subclass.

106. Plaintiff's Lloyd's Policy, as well as those of the other Class members, are contracts under which Lloyd's was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policy.

107. In the Business Income (And Extra Expense) Coverage Form, Lloyd's also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises. "Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue operations," and to repair or replace property.

108. Due to the Closure Order, Plaintiff and other members of the Class incurred Extra Expense at Covered Property

109. Plaintiff and other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Lloyd's or Lloyd's is estopped from asserting them, and yet Lloyd's has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

110. By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Lloyd's has breached its coverage obligations under the Policies.

111. As a result of Lloyd's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Lloyd's is liable, in an amount to be established at trial.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals, demand judgment against the Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(a) and Rule 23(b)(3) and declaring Plaintiff and its counsel to be representatives of the Class;

(2)     Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

(3)     Awarding Plaintiff and the Class compensatory damages from Lloyd's breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(4)     Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses; and

(5)     Awarding such other and further relief the Court deems just, proper, and equitable.

Dated: April 22, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
Florida Bar No. 984795
pgeller@rgrdlaw.com
STUART A. DAVIDSON
Florida Bar No. 084824
sdavidson@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)


**s/Stuart A. Davidson**
STUART A. DAVIDSON

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
  OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

Christopher A. Seeger
Stephen A. Weiss
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
cseeger@seegerweiss.com
sweiss@seegerweiss.com

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com

Michael J. Sacks
Florida Bar No. 0065625
THE SACKS FIRM
7210 Wisteria Avenue
Parkland, FL 33076
Telephone:  954/445-2527
msacks@bellsouth.net

*Attorneys for Plaintiff*

## DEMAND FOR A JURY TRIAL

Plaintiff and the Class request a jury trial for all Counts for which a trial by jury is permitted by law.

Dated: April 22, 2020

**s/Stuart A. Davidson**
STUART A. DAVIDSON
Florida Bar No. 084824
sdavidson@rgrdlaw.com
PAUL J. GELLER
Florida Bar No. 984795
pgeller@rgrdlaw.com
ROBBINS GELLER RUDMAN
   & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
Telephone:  561/750-3000
561/750-3000 (fax)

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
   OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

Christopher A. Seeger
Stephen A. Weiss
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
cseeger@seegerweiss.com
sweiss@seegerweiss.com

Samuel H. Rudman
ROBBINS GELLER RUDMAN
   & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com

Michael J. Sacks
Florida Bar No. 0065625
THE SACKS FIRM
7210 Wisteria Avenue
Parkland, FL 33076
Telephone:  954/445-2527
msacks@bellsouth.net

*Attorneys for Plaintiff*