**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO.: 9:20-cv-80677-UU**

SA PALM BEACH LLC., individually and on
behalf of all others similarly situated,

     Plaintiff,

vs.

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON, and UNDERWRITERS AT
LLOYD'S LONDON KNOWN AS
SYNDICATES CNP 4444, AFB 2623, AFB
623, BRT 2987, BRT 2988, NEO 2468, SAM
727, AXS1686, XIS H4202, QBE 1886, DUW
1729, WBC 5886, CHN 2015, HDU 382, MSP
318, AGR 3268, APL 1969, ACS 1856, AMA
1200, TAL 1183 and PPP 9981,

     Defendants.

_____/

**DEFENDANTS CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING**
**TO POLICY NO. PXA0001184-00'S MOTION TO DISMISS THE COMPLAINT AND**
**INCORPORATED MEMORANDUM OF LAW**

**INTRODUCTION**

     Plaintiff in this putative class action, SA Palm Beach, LLC ("Plaintiff"), seeks insurance

coverage for business interruption related to the COVID-19 pandemic from Defendants Certain

Underwriters at Lloyd's, London Subscribing to Policy No. PXA0001184-00 (misidentified in this

action as "Certain Underwriters at Lloyd's London, and Underwriters at Lloyd's London Known

as Syndicates CNP 4444, AFB 2623, AFB 623, BRT 2987, BRT 2988, NEO 2468, SAM 727,

AXS 1686, XIS H4202, QBE 1886, DUW 1729, WBC 5886, CHN 2015, HDU 382, MSP 318,

AGR 3268, APL 1969, ACS 1856, AMA 1200, TAL 1183 and PPP 9981) (hereinafter, "Underwriters").

Plaintiff's Complaint must be dismissed for several reasons:

(1) The insurance policy at issue is a Commercial Property policy that insures Plaintiff's property against direct physical loss or damage.  The policy does provide "Business Income" coverage, but in order for that coverage to apply, consistent with the property coverage being provided, there must be direct physical loss of or damage to the insured property.  Plaintiff's Complaint fails to sufficiently allege that fundamental predicate, nor under the circumstances alleged could it ever.

(2)  The policy also provides Business Income coverage if a civil authority prohibits access to insured property because of direct physical damage to nearby property. Again, Plaintiff fails to allege direct physical damage to nearby property or that access to the insured property has been prohibited because of such direct physical damage.

(3) Even if the policy's requirements discussed above had been met, coverage is excluded for any losses caused directly or indirectly by, or related in any way to, the dispersal, appearance or presence of organic pathogens, which includes viruses by definition. The Coronavirus is undoubtedly a virus.

(4) Similarly, the policy contains a microorganism exclusion, which excludes coverage for any claim arising directly or indirectly out of a microorganism.  The Coronavirus is unquestionably a microorganism.

(5) Additionally, the policy contains pollution exclusions, which preclude coverage for any claim related to substances that pose a threat to human health. Here, Plaintiff's insurance claim arises out of the Coronavirus, which poses a threat to human health.

(6) Plaintiff's Complaint, on its face, fails to meet Plaintiff's burden as Class Plaintiff under the typicality requirement of Federal Rule of Civil Procedure 23(a) and the predominance inquiry of Federal Rule of Civil Procedure 23(b).

(7) The Complaint fails to sufficiently allege causes of action for breach of contract, as Plaintiff provides no supporting facts to support its claim.

Accordingly, Underwriters' Motion to Dismiss should be granted.

## I.    FACTUAL BACKGROUND

### A.    THE POLICY

Plaintiff owns and operates a restaurant named "Sant Ambroeus Palm Beach" in Palm Beach, Florida. Underwriters subscribed to a policy that insures the property on which the restaurant is located. Policy No. PXA001184-00, issued to Plaintiff, provides coverage for direct physical loss of or damage to the property located at 340 Royal Poinciana Way, Suite 304, Palm Beach, Florida 33480[1] (the "Property") effective for the policy period of December 12, 2019, to December 12, 2020 (the "Policy"). (Exhibit A).[2]

The Policy's insuring clause provides:

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the Premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

---

[1] The insured property is identified on the Schedule of Locations of the Policy.
[2] The Policy is attached to the Complaint and reattached here for the Court's convenience.

(Policy, Exhibit A, Form CP 00 10 04 02, at p. 1 of 14).  "Covered Cause of Loss" is defined in the Policy as "direct physical loss unless the loss is excluded or limited in this policy." (Policy, Exhibit A, Form CP 10 30 10 12, at p. 1 of 10).

While the Policy does provide coverage for loss of "Business Income," the loss must also arise out of direct physical loss or damage to the insured property as identified in the "declarations" page of the Policy.  With respect to business income, the Policy's "Business Income" coverage states, in part:

**1. Business Income**

\* \* \*

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". ***The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations*** and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

(Policy, Exhibit A, Form CP 00 30 04 02, at p. 1 of 11) (emphasis added).

The Policy also provide coverage for "Extra Expense" which is defined, in part, as:

**2. Extra Expense**

**a.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no ***direct physical loss or damage to property*** caused by or resulting from a Covered Cause of Loss.

(Policy, Exhibit A, Form CP 00 30 04 02, at p. 1 of 11) (emphasis added). As noted above, "Business Income" and "Extra Expense" coverages are only provided during the "period of restoration" which is defined as:

… the period of time that:

a. Begins:

(1) 72 hours after the time of ***direct physical loss or damage*** for Business Income Coverage; or

(2) Immediately after the time of ***direct physical loss or damage*** for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should ***be repaired, rebuilt or replaced*** with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

(Policy, Exhibit A, Form CP 00 30 04 02, at p. 9 of 11) (emphasis added). In other words, the Policy does not provide coverage for business income and extra expense if the loss is caused by something other than direct physical loss or damage resulting from a covered cause of loss. And coverage is only provided for that time needed to repair, rebuild, or replace the damaged property.

The Policy provides "Civil Authority" coverage but, and again consistent with the fundamental principle of a property insurance policy, direct physical loss or damage to property is required as the civil authority action must result from damage to property caused by a Covered Cause of Loss:

**a. Civil Authority**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises ***due to direct physical loss of or damage to property***, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

(Policy, Exhibit A, Form CP 00 30 04 02, at p. 2 of 9) (emphasis added).

The Policy contains an endorsement that modifies the Civil Authority coverage.  However, none of those modifications change the basic coverage requirements of direct physical loss or damage to nearby property and a prohibition on access to the insured property because of such damage. The Policy modifies the Civil Authority extension as follows:

> The following applies to the Additional Coverage – Civil Authority under the Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form and Extra Expense Coverage Form:
>
> 1. The Additional Coverage – Civil Authority includes a requirement that the described premises are not more than one mile from the damaged property. With respect to described premises located in Florida, such one-mile radius does not apply.
>
> 2. The Additional Coverage – Civil Authority is limited to a coverage period of up to four weeks.  With respect to described premises located in Florida, such four-week period is replaced by a three-week period.
>
> 3. Civil Authority coverage is subject to all other provisions of that Additional Coverage.

(Policy, Exhibit A, Form CP 01 25 02 12, at p. 2 of 3). Thus, among the requirements to trigger civil authority coverage, damage to property must prohibit access to the Property.

The Policy contains certain applicable exclusions. Among those exclusions are an exclusion that, by definition, excludes coverage for viruses (Policy, Exhibit A, Form GSC-CP-007), the microorganism exclusion (Policy, Exhibit A, Form LMA 5018), and broad pollution exclusions (Policy, Exhibit A, Form NMA 2340 and Form CP 10 30 10 12, at p. 4 of 10).

## B.        THE INSURANCE CLAIM

On April 7, 2020, Plaintiff submitted a claim seeking recovery for business income loss as a result of local and state orders related to COVID-19 (the "Claim"). (Exhibit B, Notice of Loss). A short time later, before Underwriters could conduct any investigation into the Claim, Plaintiff filed this lawsuit. (Doc. 1). In the Complaint, Plaintiff alleges that governmental orders have

"caused direct physical loss and damage to Plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties." (Doc. 1 ¶ 78). Notably, however, the Complaint is devoid of any allegations that Plaintiff's restaurant was in fact closed or that the Plaintiff (or its employees) were prevented from accessing the premises as a result of COVID-19 or any related governmental orders. Similarly, the Complaint fails to provide any description of the "direct physical loss and damage", but instead gives an incomplete recitation of the various orders.

Specifically, Plaintiff points to governmental orders issued by the State of Florida. (*Id.* at ¶ 28). On March 1, 2020, Florida Governor Ron DeSantis issued Executive Order 20-51 directing the State Health Officer and Surgeon General to declare a public health emergency. (Doc. 1 ¶ 28; Exhibit C, Florida Executive Order 20-51).[3] This order did not require the closure of businesses. (Exhibit C). On March 9, 2020, Governor DeSantis issued Executive Order 20-52, declaring a state of emergency. (Doc. 1 ¶ 28; Exhibit D, Florida Executive Order 20-52). This order also did not mandate the closure of businesses.

On March 17, 2020, Governor DeSantis issued Executive Order 20-68, which directed restaurants to adhere to social distancing guidelines by limiting the number of patrons allowed within a building and requiring patrons to maintain a six-foot distance. (Doc. 1 ¶ 28; Exhibit E, Florida Executive Order 20-68). This order did not mandate restaurants to close. (Exhibit E). On March 20, 2020, Governor DeSantis issued Executive Order 20-71, requiring restaurants to suspend on-premises food consumption, but allowed restaurants to remain operational for delivery

---

[3] These government orders are a matter of public record. When ruling on a motion to dismiss, a district court may consider evidence if its authenticity is a matter of public record. *See Myers v. Foremost Ins. Co.*, No. 8:15-CV-1363-MSS-JSS, 2015 WL 12830477, at *3 (M.D. Fla. Oct. 23, 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)).

and take-out services. (Doc 1 ¶ 28; Exhibit F, Florida Executive Order 20-71). This order also expressly allowed employees and other personnel to access the establishments for delivery and take-out services. (Exhibit F). Moreover, this order lifted the restrictions on restaurants selling alcohol for consumption off-premises, thereby allowing restaurants to provide alcohol delivery with food purchases. (*Id.*).

On March 30, 2020, Governor DeSantis issued Executive Order 20-89, requiring Miami-Dade, Broward, Palm Beach, and Monroe Counites to restrict public access to non-essential businesses pursuant to the guidelines established by Miami-Dade County Emergency Order 07-20. (Doc. 1 ¶ 28; Exhibit G Florida Executive Order 20-89). Pursuant to Miami-Dade Emergency Order 07-20, restaurants were deemed essential businesses and were permitted to continue operations for delivery and take-out services. (Exhibit H, Miami-Dade Emergency order 07-20).[4]

All these measures were put in place to promote social distancing and slow the spread of COVID-19 by minimizing contact between residents.[5] (Exhibit C; Exhibit D; Exhibit E; Exhibit F; Exhibit G; Exhibit H). These orders were not issued as a result of any "direct physical loss of or damage" to property, as required under the Policy to trigger coverage. Moreover, the orders did not "prohibit access" to the Property, as they specifically allow employees and other personnel to

---

[4] We note that Miami-Dade Emergency Order 07-20 is applicable to Plaintiff's Claim to the extent it was incorporated into Governor DeSantis' Executive Order 20-89.

[5] Though not mentioned in Plaintiff's Complaint, Palm Beach County issued several orders to promote social distancing and minimize the spread of COVID-19. On March 13, 2020, Palm Beach County declared a State of Emergency. (Exhibit J). This order did not mandate the closure of businesses. On March 26, 2020, Palm Beach County issued Emergency Order 2020-002, ordering noncritical retail and commercial businesses to close except to the extent necessary to perform minimum basic operations. (Exhibit K). Restaurants were deemed critical businesses and were allowed to remain open subject to the guidelines set forth in Governor DeSantis' orders. (*Id.*). On March 29, 2020, Palm Beach County issued Emergency Order 2020-003a, which encouraged individuals to stay at home and to restrict travel and activities outside the home to critical activities. (Exhibit. L). On April 11, 2020, Palm Beach County issued Emergency Order 2020-0004, encouraging workers and patrons of businesses, including restaurants, to wear facial coverings and adhere to social distancing requirements. (Exhibit M). None of these orders were issued as a result of "direct physical damage" to property.

enter the premises. In fact, Governor DeSantis' April 1, 2020 Executive Order encouraged restaurants to "provide delivery, carry-out or curbside service." (Doc. 1 ¶ 28; Exhibit I, Florida Executive Order 20-91).

## II.      LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Jacobs v. Tempur-Pedic Int'l., Inc*., 626 F.3d 1327, 1332-33 (11th Cir. 2010). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," but must allege more than "labels and conclusions," "formulaic recitation of the elements of a cause of action," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts are not required to accept the labels and legal conclusions in the complaint as true. *Sinaltrainal v. Coca-Cola Co*., 578 F.3d 1252, 1261 (11th Cir. 2009).

To survive a motion to dismiss, a complaint must contain facts that, when assumed to be true, sufficiently "state a claim to relief that is *plausible on its face*." *Iqbal*, 556 U.S. at 678 (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal"). A complaint that does not "contain sufficient factual matter, accepted as true, to state a claim . . . plausible on its face" is subject to dismissal.

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (citing *Twombly*, 550 U.S. at 570).

Moreover, "when the allegations of the complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (citation and quotations omitted).

## III.    <u>ARGUMENT</u>

### A.    PLAINTIFF'S COMPLAINT FAILS TO ALLEGE DIRECT PHYSICAL LOSS OF OR DAMAGE TO PROPERTY COVERED BY THE POLICY

The Complaint contains no plausible allegations that the Property has suffered "direct physical loss or damage."  The Policy provides coverage for business income and extra expense losses if such losses are the result of "direct physical loss of or damage to" the insured Property. (Policy, Exhibit A, Form CP 00 30 04 02, at p. 1 of 9). Further, business income coverage and extra expense are only provided during the "period of restoration", which is the time it takes to repair, rebuild or replace the Property.  (Policy, Exhibit A, Form CP 00 30 04 02, at p. 9 of 11). Here, there has been no direct physical loss or damage to the Property, as evidenced by the fact that there is nothing to repair, rebuild or replace at the Property.

 The plain language of the Policy "requires direct physical loss or damage to the properties in order to trigger payment" for a business income loss. *See Lubell & Rosen LLC v. Sentinel Ins. Co.*, Ltd., No. 0:16-CV-60429-WPD, 2016 WL 8739330, at *4 (S.D. Fla. June 10, 2016). Florida law places the initial burden on an insured seeking to recover under an all-risk policy of proving that a loss occurred.  *See S.O. Beach Corp. v. Great Am. Ins. Co. of New York*, 305 F. Supp. 3d 1359, 1364 (S.D. Fla. 2018), *aff'd*, 791 F. App'x 106 (11th Cir. 2019). An insured's pleading must

sufficiently allege that its losses are covered within a policy's insuring agreement. *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1293 (M.D. Fla. 2016). "A complaint that does not 'contain sufficient factual matter, accepted as true, to state a claim . . . plausible on its face' is subject to dismissal." *Id*. at 1292 (quoting *Am. Dental Ass'n*, 605 F.3d at 1289).

Accordingly, to recover for business income loss, Plaintiff must plead and then prove that it sustained damage to property that is insured by its Policy, that the damage was caused by a covered cause of loss, and that there was an interruption to its business that was caused by the property damage. *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.*, 958 F. Supp. 594, 602 (S.D. Fla. 1997); *cf. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Texpak Grp. N.V.*, 906 So. 2d 300, 302 (Fla. 3d DCA 2005) (holding that business interruption and extra expense losses are covered "only if 'resulting from' damage or destruction of real or personal property caused by a covered peril.").

In the Complaint, Plaintiff merely alleges that it has "suffered direct physical loss of and damage to [its] property because [it has] been unable to use [its] property for its intended purpose" and that the governmental orders somehow "caused direct physical loss and damage to Plaintiff's" Property. (Doc. 1 ¶¶ 38, 78). Plaintiff also alleges that "COVID-19 is physically impacting private commercial property in Florida." (Doc. 1 ¶ 40).

Under the federal rules, pleading the bare elements of a claim is insufficient—Plaintiff "must include some supporting facts." *N.P.V. Realty Corp. v. Nationwide Mut. Ins. Co.*, No. 8:11-CV-1121-T-17TBM, 2011 WL 4948542, at *4 (M.D. Fla. Oct. 17, 2011). Here, Plaintiff makes conclusory allegations that it has suffered direct physical damage, but the Complaint is devoid of any mention of what physical damage occurred, how the physical damage occurred, and when the physical damage occurred. Accordingly, none of Plaintiff's allegations, even if taken as true, state

a plausible claim that Plaintiff has suffered a "direct physical loss or damage" as required to trigger coverage under the Policy.  *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, No. 8:15-cv-1821-T-17TBM, 2016 WL 8943313, at *2 (M.D. Fla. Feb. 4, 2016) ("[I]t is not sufficient to plead that the Plaintiff has suffered damages in the form of 'direct physical damage to its property.'").

The phrase "direct physical loss or damage" "must be given its common meaning." *Rockhill Ins. Co. v. Northfield Ins. Co.*, 297 F. Supp. 3d 1279, 1286 (M.D. Fla. 2017). This Court has concluded that "[a] direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.'" *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) (quoting *Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 779 (2010)). If the property can be cleaned and restored to its original function, no covered loss has been suffered.  *Id.* ("cleaning is not considered direct physical loss"). The relevant inquiry is whether the structure continues to function.  Indeed, "[t]he fact that the restaurant needed to be cleaned more frequently does not mean [the plaintiff] suffered a direct physical loss or damage." *Id.*  Furthermore, as stated by the oft-cited Couch on Insurance, and as explicitly adopted by this Court:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*Id.* (quoting 10A Couch on Ins. § 148:46 (3d. Ed. West 1998)); *see also Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) ("In ordinary parlance and widely

accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure.").

In the context of a lawsuit seeking injunctive relief against an insurer for business income coverage related to COVID-19, one court already found that the disease and the virus that causes it do not cause physical loss or damage.  Teleconference, Order to Show Cause at 4-5, *Soc. Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.,* No. 20-CV-3311-VEC (S.D.N.Y. May 14, 2020) (Transcript with oral findings attached hereto as Exhibit N). With regard to COVID-19, the Court in *Soc. Life Magazine* noted: "It damages lungs.  It doesn't damage printing presses."  (*Id.* at 4:25-5:4).[6]

Moreover, the Policy only provides coverage for business income and extra expense losses incurred during the "period of restoration" which begins with the "direct physical loss or damage" and ends on the earlier of "(1) The date when the property at the described premises should be repaired, rebuilt or replaced . . . or (2) The date when business is resumed at a new permanent location." (Policy, Exhibit A, Form CP 00 30 04 02, at p. 9 of 11). Thus, it follows that for there to be coverage under the Policy's business income or extra expense coverage, Plaintiff's loss must involve some physical damage to covered property that needs to be repaired, rebuilt, or replaced. As explained by the Southern District of New York, "the words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it." *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co*., 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) (citations omitted); *see also Phila. Parking Auth. v. Fed. Ins. Co*., 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005)

---

[6] Plaintiff attempts to argue that the governmental orders caused loss of use, which is somehow "direct physical loss or damage." Such creative interpretations fail as this Court, in *Mama Jo's*, rejected the notion that loss of use equates to physical damage.  *Mama Jo's*, 2018 WL 3412974, at *9.

("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature.").

Any other reading of the Policy to allow recovery for Plaintiff's Claim would render central contract terms superfluous. Under Florida law, "insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Further, "courts must not construe insurance policy provisions in isolation, but instead should read all terms in light of the policy as a whole, with every provision given its full meaning and operative effect." *Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 734 F. Supp. 2d 1304, 1314 (S.D. Fla. 2010) (citations omitted). Courts may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998).

Thus, under the plain language of the Policy, coverage is only afforded for business income and extra expense losses if those losses are caused by direct physical loss or damage. Here, Plaintiff's Claim is solely economic in nature and does not relate to any sort of physical damage, and, therefore, is not covered under the Policy. *See Bahama Bay II Condo. Ass'n, Inc v. United Nat'l Ins. Co.*, 374 F. Supp. 3d 1274, 1278 (M.D. Fla. 2019) ("cost of security guards and security fencing…is not property damage, or 'physical loss…' but is an economic loss. There is nothing in the Policy that covers economic loss."); *see also* Exhibit N, Order to Show Cause at 15 ("[T]his kind of business interruption needs some damage to the property . . . this is just not what's covered under these insurance policies.")

Accordingly, Plaintiff's Complaint does not allege any facts that trigger coverage under the Policy and its claims fail as a matter of law.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156| T: 786-870-5600 | F: 855-802-5821

CASE NO.: 9:20-cv-80677-UU

## B.  PLAINTIFF HAS NOT PLED A VALID CIVIL AUTHORITY CLAIM

The allegations also fail to trigger the Policy's civil authority coverage. In Florida, the "policyholder bears the initial burden of proving that a loss occurred under the insuring agreement during the policy period." *Somethings Fishy Enter., Inc. v. Atl. Cas. Ins. Co.*, 415 F. Supp. 3d 1137, 1142 (S.D. Fla. 2019).  The civil authority coverage requires direct physical loss or damage to property near the insured property and further requires that access to the insured property is prohibited because of that damage.[7] Plaintiff's effort to obtain civil authority coverage fails because (1) it alleges no such physical damage, and (2) access to the Property has never been prohibited.

In the Complaint, Plaintiff alleges that it has suffered direct physical loss of and damage to its Property because it has been unable to "use [its] property for its intended purpose," as a result of measures put in place by the State of Florida. (Doc. 1 ¶¶ 38–39). Then, Plaintiff alleges that these orders required the suspension of its restaurant's operations. (Doc. 1 ¶ 78).[8] However, these orders did not require the restaurant to close. In fact, Governor DeSantis encouraged all restaurants to continue providing take-out, delivery, and curbside services. (*See* Exhibit I).

Plaintiff appears to assert that Governor DeSantis' orders somehow trigger the Policy's coverage extension for civil authority. (*See* Doc. 1 ¶¶ 28, 88, 93). As noted above, the civil authority coverage requires that there be "direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." A "Covered Cause of Loss" is defined as "direct physical loss." Accordingly, the first requirement of the civil

---

[7] Plaintiff may contend that the Policy's language does not require the damaged property to be near the insured premises. Even if this were true, Plaintiff's civil authority claim fails because it does not allege direct physical loss or damage to *any* property, near or far.

[8] Plaintiff's restaurant was, in fact, operational while Plaintiff represented in its pleadings that it was not.

authority coverage is that there be direct physical loss that causes damage to property other than the insured property.  Next, because of that damage to nearby property, a civil authority must prohibit access to the insured property. The action of the civil authority must also be "due to," or the result of, such direct physical loss. (Policy, Exhibit A, Form CP 00 30 04 02, at p. 2 of 11). In other words, because of direct physical loss that causes damage to other property, the civil authority must prohibit access to the insured location because the nearby property damage has created a dangerous condition. Plaintiff fails to allege these necessary elements. In fact, Plaintiff specifically alleges that the "efficient proximate cause" of its losses were "*precautionary* measures taken by the State of Florida to prevent the spread of COVID-19 in the future, *not* because coronavirus was found in or on Plaintiff's insured property." (Doc. 1 ¶ 39) (emphasis added).

The plain language of the Policy makes clear that coverage requires damage to property other than the described premises *and* an order of civil authority, because of the damage, prohibiting access to the insured's property. *See, e.g.*, *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011) ("Civil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property."). As explained above, COVID-19 does not cause physical damage or loss to property, and therefore, Plaintiff cannot satisfy the conditions of the civil authority coverage extension. Even looking beyond that shortcoming, there are two more reasons why Plaintiff cannot fulfill the conditions of the civil authority coverage extension: (1) access to the Property has not been "prohibited;" and (2) the subject government orders were not taken in response to damaged property.

First, Plaintiff's allegations that the subject government orders "require[ed] suspension of operations at the [Property]," is demonstrably false. (Doc. 1 ¶ 40). As previously detailed, Plaintiff was never required to cease delivery, take-out, or pick-up services. No government order prevented Plaintiff itself, or its employees, from entering the Property, and indeed certain orders actually encouraged access. Although Florida courts do not appear to have considered the issue, numerous other courts have recognized that government orders that hamper access to insured property—but do not entirely *prohibit* it— are insufficient to trigger civil authority coverage. *See, e.g.*, *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1140 (10th Cir. 2004) (upholding denial of hotel operators' claim for lost business income sustained when customers cancelled visits due to order grounding of flights after the 9/11 attacks); *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, No. 06-770-C, 2007 WL 2489711, at *1 (M.D. La. Aug. 29, 2007) (holding that civil authority provision was not triggered by Louisiana government order prior to Hurricane Katrina advising residents to stay off the streets because advisories did not "prohibit access" to the insured premises); *By Dev. Inc. v. United Fire & Cas. Co.*, No. Civ. 04-5116, 2006 WL 694991, at *6 (D.S.D. Mar. 14, 2006) (finding that road closures after wildfire did not prohibit access to insured's business); *54th Street Partners v. Fid. & Guar. Ins. Co.*, 305 A.2d 67, 67 (N.Y. Super. Ct. App. Div. 2003) (holding that civil authority extension did not apply to insured who made lost business income claim due to city government's diversion of vehicular and pedestrian traffic in the proximity of its restaurant, because access to the restaurant was not denied). Since the civil authority extension requires Plaintiff to show that access to its Property was "prohibited" by civil authority, and Plaintiff did not make any such allegations (nor indeed could it), the civil authority extension does not apply.

Second, the subject government orders were not issued in response to physical damage to nearby property. Rather the orders were issued as precautionary measures to prevent the further spread of COVID-19 (Doc. 1 ¶ 39). In such situations, the civil authority extension is not triggered. *See Syufy Enter. v. Home Ins. Co. of Ind.*, No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995). As detailed in *Syufy*, after the return of the Rodney King verdict and subsequent riots, the cities of Los Angeles, San Francisco, and Las Vegas imposed dawn-to-dusk curfews. *Id.* at *1. An insured movie theater operator, who ran theaters in all three cities, brought a business interruption claim because it closed its theaters during these curfew periods. *Id.* The court concluded there was no civil authority coverage because not only did the civil orders not specifically prohibit individuals from entering the theaters, but the "requisite causal link between damage to adjacent property and denial of access to a Syufy theater [was] absent." *Id.* at *2. In other words, Syufy had closed its theaters as a "direct result of the city-wide curfews," not as a result of adjacent property damage. Furthermore, the court noted that even though the curfews were imposed to "prevent" property damage, they were not the result of the damage itself. *Id.* at *2. Other courts have reached similar conclusions. *See United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 353 (S.D.N.Y. 2005) (holding civil authority coverage did not apply to airport's business interruption claim arising from grounding of flights after the 9/11 attacks because the order to ground flights and bar access to the airport was "to prevent further attacks and as a matter of national security," not because of damage to the Pentagon); *City of Chi. v. Factory Mut. Ins. Co.*, No. 02-C-7023, 2004 WL 549447, at *4 (N.D. Ill. Mar. 18, 2004) ("The business interruption . . . was due to the ground stop order imposed by the FAA in order to prevent further terrorist attacks."); *cf. Prime Alliance Grp., Ltd. v. Hartford Fire Ins. Co.*, No. 06-22535-CIV-

UNGARO, 2007 WL 9703576, at *4 (S.D. Fla. Oct. 19, 2007) ("[A] plain language reading of this section provides coverage when a peril—such as a windstorm—causes damage to property and, as a result, access to property is precluded by a civil authority order. The order of civil authority cannot in any reasonable manner be construed as a 'peril.'").

Plaintiff cannot establish that physical damage occurred due to COVID-19, nor can it establish that the government orders, as specified and incorrectly characterized in the Complaint, prohibited access to the Property. Moreover, as admitted by Plaintiff, these government orders were not taken in response to covered physical damage but were instead preventative measures issued for public health purposes. Accordingly, the Policy's civil authority coverage extension is not triggered.

**C.     COVERAGE IS BARRED BY THE  PLAIN LANGUAGE OF THE POLICY**

The Complaint must be dismissed because Plaintiff's Claim is excluded from coverage by the plain language of the Policy. When resolving insurance coverage disputes, courts "routinely dismiss complaints for failure to state a claim when a review of the insurance policy and the underlying claim for which coverage is sought unambiguously reveals that the underlying claim is not covered." *Cammarota v. Penn-Am. Ins. Co.*, No. 17-CV-21605-Williams, 2017 WL 5956881, at *2 (S.D. Fla. Nov. 13, 2017); *see also Arias-Bonello v. Progressive Select Ins. Co.*, No. 0:17-CV-60897-UU, 2017 WL 7792704, at *5 (S.D. Fla. Aug. 8, 2017) (dismissing putative class member's breach of contract claims because the claims were expressly excluded from the policy); *MJCM, Inc. v. Hartford Cas. Ins. Co.*, No. 8:09-CV-2275-T-17TBM, 2010 WL 1949585, at *7 (M.D. Fla. May 14, 2010) (granting motion to dismiss under Rule 12(b)(6) because underlying lawsuit was not covered under the subject insurance policy). Here, even if Plaintiff could

CASE NO.: 9:20-cv-80677-UU

demonstrate a claim within the Policy's coverage grants (which it cannot), coverage nonetheless

is excluded for losses arising out of "organic pathogens" including viruses. Specifically, the

exclusion provides:

> This endorsement modifies insurance provided by this policy.
>
> ***We do not cover loss, damage, cost, fine, penalty or expense caused directly or indirectly by, arising out of, in connection with, resulting from, contributed to or related in any way by exposure to*** or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or ***organic pathogens***. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.
>
> **The term "organic pathogen" or "organic pathogens" means any** organic irritant or contaminant including but not limited to the following: mold, fungus, bacteria, or ***virus*** including but not limited to the following fungi or mycotoxins produced by such fungi: Aspergillus, Penicillium, Stachybotrys chartarum, Trichodema, and Fusarium Memnoniella.
>
> * * *
>
> ***This exclusion includes but is not limited to***: (1) any cost, expense or charge to test, monitor, cleanup, remediate, remove, contain, treat, detoxify, neutralize, rehabilitate, ***or in any way respond to*** or assess the effects of mold, mildew, mycotoxins, fungi or ***organic pathogen***; or (2) any cost, expense or charge in connection with the actual or alleged discharge, dispersal, seepage, migration, release, escape, exposure to, manifestation, appearance, presence, or growth of mold, mildew, mycotoxins, fungi or organic pathogens.

(Policy, Exhibit A, Form GSC-CP-007) (emphasis added). SARS-CoV-2 is the virus that causes

COVID-19, from which Plaintiff's Claim arises. Thus, SARS-CoV-2 is an "organic pathogen" and

Plaintiff's Claim is excluded.

When a policy exclusion is plain and enforceable, it must be enforced as written. *See*

*Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ("[I]f a policy

provision is clear and unambiguous, it should be enforced according to its terms whether it is a

basic policy provision or an exclusionary provision"). Though the issue has not been directly

addressed by a Florida court, at least one federal court has applied the exclusion to pathogens capable of causing bodily injury. *See Mount Vernon Fire Ins. Co. v. Adamson*, No. 3:09cv817-HEH, 2010 WL 3937336, at *3 (E.D. Va. Sept. 15, 2010). This Court has recognized the applicability of this exclusion, including the specific "organic pathogen" language that is applicable here. *See Endurance Am. Specialty Ins. Co. v. Savits-Daniel Travel Ctrs., Inc.*, 26 F. Supp. 3d 1296, 1303 n. 3 (S.D. Fla. 2014) (suggesting that exclusion for 'organic pathogens' could apply to preclude coverage for a claim arising from inhalation of pepper spray, although the court did not know the specific contents of the subject pepper spray to determine whether it was "organic").

The Policy explicitly excludes coverage for loss or expense caused "directly or indirectly by" or "related in any way . . . to" the "dispersal," "appearance" or "presence" of organic pathogens, which- includes "virus." (Policy, Exhibit A, Form GSC-CP-007). There can be no question that SARS-CoV-2, which causes COVID-19, is a virus—Plaintiff concedes this fact in its Complaint. (Doc. 1 ¶ 17 ("SARS-CoV-2 is an RNA *virus*.")).[9] Plaintiff's Claim was "a result of the [subject government orders] intended to mitigate the COVID-19 pandemic." (Doc. 1 ¶ 80).

---

[9] To be sure, COVID-19 is a disease caused by SARS-CoV-2, which is a virus by any definition. Alexander E. Gorbalenya et al., *The species Severe acute respiratory syndrome-related coronavirus: classifying 2019-nCoV and naming it SARS-CoV-2*, 6 NATURE MICROBIOLOGY 526, 526 (March 2, 2020). Also, Underwriters take this opportunity to note that this Court has repeatedly considered secondary sources such as scholarly articles at the motion to dismiss stage. *See Jones v. Santander Consumer USA Inc.*, No. 16-14012-CIV-ROSENBERG/LYNCH, 2016 WL 11570406, at *3 (S.D. Fla. Aug. 2, 2016) (listing secondary sources that conflict with argument in motion to dismiss); *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1371 n. 1 (S.D. Fla. 2015) (incorporating numerous secondary sources cited in Rule 12(b)(6) motion to dismiss); *cf. Aldar Tobacco Grp., LLC v. Am. Cigarette Company, Inc.*, No. 08-62018-CIV-JORDAN, 2010 WL 11601994, at *1 (S.D. Fla. Dec. 29, 2010) (admonishing attorney for citing "zero cases, statutes, codes, or *secondary sources* in his motion to dismiss) (emphasis added). Ultimately, this Court has "complete discretion" to accept material beyond the pleadings when considering a motion to dismiss. *Continental Cas. Co. v. Hardin*, No. 8:16-cv-322-17GW, 2016 WL 11234458, at *11 (M.D. Fla. Dec. 5, 2016). Plaintiff has already referenced numerous such sources in its Complaint. (*See* Doc. 1). The Court should exercise its discretion in this instance to best determine whether Plaintiff has adequately stated a claim for which relief can be granted.

Accordingly, the Claim as alleged is directly or indirectly caused by, or is related in any way to, a virus and is excluded from coverage under the Policy.

### D.    COVERAGE IS BARRED BY THE MICROORGANISM EXCLUSION

In addition, the Policy contains a Microorganism Exclusion, which also excludes coverage for Plaintiff's alleged losses. The Microorganism Exclusion provides:

> ***This policy does not insure any loss, damage, claim***, cost, expense or other sum directly or indirectly arising out of or relating to:
>
> > mold, mildew, fungus, spores or other ***micro-organisms of any type***, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.
>
> This exclusion applies regardless whether there is (i) any physical loss or damage to insured property; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.
>
> This exclusion replaces and supersedes any provision in the policy that provides insurance, in whole or in part for these matters.

(Policy, Exhibit A, Form LMA 5018). As set forth below, SARS-CoV-2, the Coronavirus that causes COVID-19 is a microorganism.   Therefore, the plain language of this exclusion bars Plaintiff's Claim, which directly or indirectly arises from COVID-19.

Florida law requires that the Microorganism Exclusion be applied as written. *See Taurus Holdings, Inc.*, 913 So. 2d at 532. Stated differently, when interpreting unambiguous policy terms, "there is no special construction or interpretation required, and the plain language of the policy will be given the meaning it clearly expresses." *Phila Indem. Ins. Co. v. Yachtsman's Inn Condo Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1323 (S.D. Fla. 2009).

The only two jurisdictions to have substantively addressed similar microorganism exclusions, with one being a Florida circuit court, both found the exclusion to be valid and

enforceable. *See Certain Underwriters at Lloyd's of London Subscribing to Policy No. SMP 3791 v. Creagh*, 563 F. App'x 209, 211 (3d Cir. 2014) (holding that the district court correctly applied the microorganism exclusion to the plaintiff's claim); *Certain Underwriters at Lloyd's, London Subscribing to Policy No. W15F03160301 v. Houligan's Pub & Club, Inc.*, No. 2017-31808-CICI, 2019 WL 5611557, at \*11 (Fla. Ct. Ct. Oct. 24, 2019) (concluding that "the Microorganism Exclusion bars coverage for the claims in this case"). In *Creagh*, the insured's claim arose after a tenant of its building died and the decomposition of the tenant's body damaged his apartment unit. *Creagh*, 563 F. App'x at 209. The United States District Court for the Eastern District of Pennsylvania held that the subject microorganism exclusion applied because the fluids that escaped the tenant's body and contaminated the unit contained bacteria, which are microorganisms. *See Certain Underwriters at Lloyd's London v. Creagh*, No. 12-571, 2013 WL 3213345, at \*3 (E.D. Pa. June 26, 2013). The Third Circuit upheld the decision on appeal. *Creagh*, 563 F. App'x at 211.

A Florida circuit court similarly recognized the unambiguous nature and enforceability of microorganism exclusions in the *Houligan's* case. In *Houligan's*, an insured suffered damage when its building was flooded with sewage and waste following a hurricane. *Houligan's*, 2019 WL 5611557, at \*1. In applying the microorganism exclusion to the plaintiff's claim, the *Houligan's* court stated:

> For better or worse, the parties bargained for an insurance policy that contains an extremely broad Microorganism Exclusion, one which supersedes and replaces any language in the Policy that might otherwise provide coverage for the loss in question. As noted, the exclusion applies even in the presence of an insured peril or cause that contributes concurrently to the insureds' loss. This Court must apply the Policy in a manner consistent with its plain language. Doing so leads the Court to conclude that the Microorganism Exclusion bars coverage for the claims in this case.

*Id.* at \*11. Significantly, the *Houligan's* court looked to the Center for Disease Control's website and dictionary definitions to find that E. Coli and enterococcus, both of which were present in the sewage and waster, are bacteria, and thus, microorganisms that cause an actual or potential threat to human health. *Id.* The decision in *Houligan's* provides a legal roadmap for this Court because SARS-CoV-2 is a microorganism that causes an actual or potential threat to human health, and any claim arising out of SARS-CoV-2 or COVID-19, regardless of whether physical damage occurred, is therefore excluded from coverage.

Secondary sources, like those relied upon by the *Houligan's* court, support a determination that SARS-CoV-2 is a microorganism. No less than the foremost U.S. governmental authority in the fight against COVID-19—the U.S. Department of Health and Human Services, National Institutes of Health and National Institute of Allergy and Infectious Diseases—defined microorganism as "microscopic organisms, including bacteria, viruses, fungi, plants, and animals."[10] This is consistent with the findings of other governmental agencies.[11] Adding additional support, scientific journals and textbooks also state that viruses are microorganisms.[12] Non-scientific sources such as Encyclopedia Britannica, for instance, list the following "major groups of microorganism": bacteria, archaea, fungi, algae, protozoa, and viruses.[13] Lastly, even

---

[10]   *Understanding Microbes in Sickness and in Health*, U.S. DEP'T OF HEALTH & HUMAN SERVS., NAT'L INST. OF HEALTH 47 (Jan. 2006) (Attached hereto as Exhibit O).
[11]   *What is a Microorganism?* NAT'L PARK SERV., U.S. DEP'T OF INTERIOR, 2 (April 2014), https://www.nps.gov/common/uploads/teachers/lessonplans/What%20is%20a%20Microorganism%20Activity%20 Guide2.pdf (listing viruses as one of the five categories of microorganisms).
[12]   *See, e.g.*, Wendy Keenleyside, MICROBIOLOGY: CANADIAN EDITION, § 1.3 (June 23, 2019) ("Viruses are acellular microorganisms."); Kathryn Nixdorff, et al., *Critical Aspects of Biotechnology in Relation to Proliferation*, 150 NATO SCI. SERIES II: MATHEMATICS PHYSICS & CHEMISTRY, 33, 33 (2004) ("Viruses are microorganisms").
[13]   *See Types of Microorganisms*, ENCYCLOPEDIA BRITANNICA (last visited May 6, 2020), https://www.britannica.com/science/microbiology/Types-of-microorganisms.

the sources cited to by Plaintiff in its Complaint support the conclusion that SARS-CoV-2 is a microorganism.[14]

As a result, the Microorganism Exclusion unambiguously excludes coverage for the Plaintiff's Claim and Plaintiff's Complaint should be dismissed.

### E.    COVERAGE IS BARRED BY THE POLLUTION EXCLUSIONS

Not only is Plaintiff's Claim barred by the plain language of the exclusion preluding coverage for organic pathogens, and Microorganism Exclusion, but the Policy also contains two enforceable exclusions barring coverage for contaminants and contamination. First, the Policy contains the Seepage and/or Pollution and/or Contamination Exclusion, which provides:

> SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION USA & CANADA
>
> Notwithstanding any provisions to the contrary within the Policy of which this Endorsement forms part (or within any other Endorsement which forms part of this Policy, this Policy does not insure:
>
> (a) any loss, damage, cost or expense, or
>
> (b) any increase in insured loss, damage, cost or expense, or
>
> (c) any loss, damage, cost, expense, fine or penalty, which is incurred, sustained or imposed by order, direction, instructions or request of, or by agreement with, any court, government agency or any public, civil or military authority, or threat thereof, (and whether or not as a result of public or private litigation.)
>
> which arises from any kind of seepage or any kind of pollution and/or contamination, or threat thereof, whether or not caused by or resulting from a Peril Insured, or from steps or measures taken in connection with the avoidance, prevention, abatement, mitigation, remediation, clean-up or removal of such seepage or pollution and/or contamination or threat thereof.

---

[14] *See* Doc. 1 ¶ 15, n. 3 (citing Roujian Lu et al., *Genomic characterization and epidemiology of 2019 novel coronavirus: implications for virus origins and receptor binding*, 395 THE LANCET 565, 565 (Feb. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf (referring to SARS-CoV-2 as an "unidentified microbial agent"); *Id.* at ¶ 23, n. 16 (citing *Modes of transmission of virus causing COVID-19: implications for IPC precaution recommendations*), WORLD HEALTH ORG. (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (referring to airborne transmission of COVID-19 through the presence of "microbes within droplet nuclei")).

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012 | MIAMI, FL 33156 | T: 786-870-5600 | F: 855-802-5821

CASE NO.: 9:20-cv-80677-UU

* * *

The term 'any kind of seepage or any kind of pollution and/or contamination' as used in this Endorsement includes (but not limited to):

(a) seepage of, or pollution and/or contamination by, anything, including but not limited to, any material designated as 'hazardous material' by the United States Environmental Protection Agency or as 'hazardous material' by the United States Department of Transportation, or defined as a 'toxic substance' by the Canadian Environmental Protection Act for the purposes of Part II of that Act, or any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any Federal, State, Provincial, Municipal or other law, ordinance or regulation; and

(b) the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

(Policy, Exhibit A, Form NMA2340).[15] The Policy also contains the following exclusion, which

states:

2.      We will not pay for loss or damage caused by or resulting from any of the following:

* * *

l.      Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss."

(Policy, Exhibit A, Form CP 10 30 10 12, at p. 4 of 10). The term "pollutant" is defined, in part,

as "any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot,

fumes, acids, alkalis, chemicals and waste." (Policy, Exhibit A, Form CP 00 30 04 02, at p. 9 of

11). Under the plain language of either of these exclusions (collectively, the "Pollution

Exclusions"), and Florida law, coverage for the Claim is excluded.

---

[15] Notably, the "pollutant/contamination" exclusion applies "[n]otwithstanding any provision to the contrary" and it does not replace or supersede any similar provisions.

The Florida Supreme Court has recognized that pollution exclusions extend beyond merely "environmental or industrial pollution." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998) (holding that a claim arising from an ammonia spill fell within a pollution exclusion). Instead, the plain language of pollution exclusions should be enforced as written and Florida courts should not "place limitations upon the plain language of a policy exclusion simply because [they] may think it should have been written that way." *Id.* at 1139. This includes the term "contaminant," which the Florida Supreme Court held to be unambiguous. *See id.*

SARS-CoV-2 undoubtedly qualifies as "contamination." The Southern District of Florida has recognized that "living organisms," "microbial populations," "microbial contaminants," and "indoor allergens" fit the ordinary definition of a "contaminant." *Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325, 1334 (S.D. Fla. 2006). In *Nova*, this Court reasoned that these substances "infected the plaintiffs' bodies or made them impure by contact, thereby fitting the ordinary meaning of a 'contaminant,' and having an effect commonly known as 'contamination.'" *Id.* Relatedly, this Court has enforced a pollution exclusion to exclude coverage for a claim arising from "viral contaminants" and "harmful microbe[s]" found in an insured's swimming pool, from which a guest alleged that he contracted the Coxsackie virus. *See First Specialty Ins. Corp. v. GRS Mgmt. Assocs., Inc.*, No. 08-81356-CIV, 2009 WL 2524613, at *4-5 (S.D. Fla. Aug. 17, 2009); *see also James River Ins. Co. v. Epic Hotel, LLC*, No. 11-CV-24292-UU, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (applying pollution exclusion to bar coverage for claims arising from Legionnaire bacteria). Other courts have reached analogous conclusions. *See, e.g.*, *U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485, 487, 490 (6th Cir. 2003) (applying a pollution exclusion

to sewage water that was alleged to contain "pathogens, carcinogens, and disease carrying organisms including but not limited to HIV viruses, *e. coli* bacteria, hepatitis (all strains), and other bacteria"); *Certain Underwriters at Lloyd's London v. B3, Inc.*, 262 P.3d 397, 400-401 (Okla. Ct. App. 2011) (holding a pollution exclusion applied to claim stemming from contaminated water alleged to contain, among other things, "bacteria (including E. Coli) [and] viruses").

The Policy's definitions of "contamination" and "pollutant" unambiguously encompass SARS-CoV-2 and the disease it causes. Just as this Court reasoned in *Nova*, SARS-CoV-2 is a virus that infects peoples' bodies, thereby fitting the ordinary meaning of "contaminant." *Nova Cas. Co.* 424 F. Supp. 2d at 1334. Similarly, under pollution exclusions like the Policy's "pollution exclusion," claims stemming from viruses are precluded from coverage, as demonstrated by this Court's decision in *First Specialty Ins. Corp. See* 2009 WL 2524613, at *4-5. SARS-CoV-2 has been "designated or defined" as "dangerous" by both Federal and State ordinances or regulations. Indeed, the U.S. Department of Health and Human Services has determined that the "SARS coronavirus" (SARS-CoV), to which SARS-CoV-2 is related,[16] is a "biological agent . . . and toxin" with "the potential to pose a severe threat to public health and safety." 42 C.F.R. § 73.3(a) & (b) (2017). Moreover, in the subject executive orders issued by Governor DeSantis, the Governor stated that he is "responsible for meeting the *dangers* presented to this state and its people by [COVID-19]." (Exhibit F (emphasis added); *see also* Exhibit I). Thus, COVID-19 has

---

[16] *See COVID-19, MERS & SARS*, NAT'L INST. OF ALLERGY & INFECTIOUS DISEASES (April 6, 2020), https://www.niaid.nih.gov/diseases-conditions/covid-19; Alping Wu, et al, *Genome Composition & Divergence of the Novel Coronavirus (2019-nCov) Originating in China*, Commentary, 27 Cell Host & Microbe 325, 326 (Mar. 11, 2020) ("[T]he 2019-nCov is in the same *Betacoronavirus* clade as MERS-CoV, SARS-like bat CoV, and SARS-CoV.").

CASE NO.: 9:20-cv-80677-UU

been defined as dangerous to human health by both the federal government and government of Florida.

Having established that SARS-CoV-2 would qualify as a pollutant and/or contaminant under the Policy and Florida law, the Pollution Exclusions clearly apply, given that they exclude coverage for claims "arising from" or "resulting from" contamination. (Policy, Exhibit A, Form NMA2340). Causation phrases such as these are broadly construed in Florida. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) (holding that causation phrase "arising out of" is broader than "caused by" as used in an exclusion). Moreover, Plaintiff asserts that its Claim was "a result of the [subject government orders] intended to mitigate the COVID-19 pandemic." (Doc. 1, ¶ 80). Accordingly, the Claim as alleged arose from or resulted from COVID-19 and is excluded from coverage under the Policy.

### F.   PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM FOR CLASS RELIEF

Plaintiff's Complaint fails to state a claim for class relief for two reasons. First, Plaintiff is not a member of the proposed class, as the Policy does contain an exclusion for pandemics (or epidemics), or anything else caused by microorganisms. Second, it is clear on the face of Plaintiff's Complaint that it does not satisfy Rule 23(b)'s predominance inquiry. Because Plaintiff's Complaint is facially deficient, the Court should consider the legal insufficiencies of its class allegations at this time.

### 1.   <u>This Court Can and Should Consider the Legal Insufficiencies of Plaintiff's Class Allegations</u>

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time

and money by the parties and the court." *Bell Atl. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks omitted). This is especially true for claims for class relief. *Cf. Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945 (6th Cir. 2011) (affirming the district court's judgment striking class allegations and dismissing a lawsuit prior to discovery, where the issues involved "a largely legal determination" and "no proffered or potential factual development offer[ed] any hope of altering that conclusion."); *accord* Fed. R. Civ. P. 23(c)(1)(A) (a district court must " [a]t an early practicable time after a person sues or is sued as a class representative . . . determine by order whether to certify the action as a class action"); *Kamm v. California City Dev. Co.*, 509 F.2d 205, 213 (9th Cir. 1975); *DeBord v. Texas CES, Inc*., No. MO:17-CV-215, 2018 WL 1858234, at *3 (W.D. Tex. Apr. 3, 2018).

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). To justify departing from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)); *see also Alonso as Next Friend of I.A. v. Sch. Bd. of Collier Cty., Fla.*, 2018 WL 5304813, at *5 (M.D. Fla. Aug. 8, 2018). This requirement—referred to as "typicality"— is one of the four requirements that must be fulfilled to demonstrate that class representatives are appropriate.[17] *See* Fed. R. Civ. Pro. 23(a).

---

[17] The other three requirements are: numerosity, commonality, and adequate representation. *See* Fed. R. Civ. Pro. 23(a). While Underwriters contest that Plaintiff satisfies any of these requirements, the failure to satisfy the typicality requirement, as demonstrated below, is evident from the allegations in the Complaint and must be addressed at this stage of the proceedings, rather than during class certification.

Underwriters are aware that some courts may be hesitant to rule on the adequacy of class representation at the motion to dismiss junction. However, Plaintiff falls blatantly outside of the scope of the class it claims to represent and, as such, fails to satisfy Federal Rule of Civil Procedure 23(a). Even if Plaintiff did fall within the class it purports to represent, it does not satisfy Rule 23(b)(3)'s predominance inquiry. The Eleventh Circuit has held that under certain circumstances, a court may rule on the propriety of class certification from the face of the complaint. *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997). Furthermore, this Court has recognized that class allegations can be properly addressed by motions to dismiss. *Saunders v. BellSouth Advert. & Pub. Corp.*, No. 98-1885-CIV, 1998 WL 1051961, at *1 n. 2 (S.D. Fla. Nov. 10, 1998) (granting motion to dismiss class action because "it seems clear to the Court based on the Complaint that the Plaintiffs' claims do not satisfy the commonality or typicality requirements of Rule 23(a)"). This is one of those circumstances, as Plaintiff's class allegations are facially deficient. Accordingly, this Court may properly dismiss Plaintiff's class allegations.

> 2.    **Plaintiff is Not a Part of the Class It Purports to Represent, Failing to Satisfy the Typicality Requirement of Rule 23(a)**

In the Complaint, Plaintiff defines the nationwide class it purports to represent as:

> All entities who have entered into *standard* all-risk commercial property insurance policies with Lloyd's, where such policies provide for business income loss and extra expense coverage *and do not exclude coverage for pandemics*, and who have suffered losses due to measures put in place by civil authorities to stop the spread of COVID-19.

(Doc. 1 ¶ 53 (emphasis added)).[18] While Underwriters contest that the Policy provides business income loss and extra expense coverage for the Claim, it is indisputable that the Policy has

---

[18] Plaintiff also defines a Florida Sub-Class, under the same definition but limited to insured property in Florida, to which Plaintiff does not belong for the same reasons set forth in this Section.

individual endorsements, making it non-standard, and excludes coverage for pandemics caused by microorganisms, including viruses.

To argue that the Policy provides "standard" coverage, Plaintiff claims the Policy has "standard forms that are used by Lloyd's for all insureds having applicable coverage." (*Id.* ¶ 30). From there, the Complaint references CP 00 30 and CP 10 30 forms. (*Id.* ¶¶ 32–36). In so doing, Plaintiff ignores numerous changes made to the Policy through the use of non-standard forms, such as Form GSC-GN-001, which contains three pages of changes to the "standard" wording. (Policy, Exhibit A, Form GSC-GN-001). Among those changes is the Seepage and/or Pollution and/or Contamination Exclusion. (*Id.*). The Microorganism Exclusion and the Policy's exclusion precluding coverage for organic pathogens, including viruses, are also not "standard." (Policy, Exhibit A, LMA 5018; Policy, Exhibit A, Form GSC-CP-007). All told, Plaintiff's Policy is not "standard," and as such, Plaintiff is not part of its own proposed class.

As noted above, the Policy contains exclusions that apply to viruses such as SARS-CoV-2. Even if the Court were to disagree that these exclusions applied here, they surely apply to some pandemics. Plaintiff's class definition is broadly defined to include entities with policies that do not exclude coverage for "pandemics," meaning that Plaintiff, by virtue of these exclusions in the Policy, does not meet the parameters of its class definition.

COVID-19 is, of course, not the first or only pandemic.[19] "Pandemic" is defined as "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high

---

[19] *See, e.g.*, Michael S. Rosenwald, *History's deadliest pandemics, from ancient Rome to modern America*, WASHINGTON POST, (April 7, 2020), https://www.washingtonpost.com/graphics/2020/local/retropolis/coronavirus-deadliest-pandemics/.

proportion of the population."[20] Pandemics are, by no means, limited to viral diseases. The Bubonic plague, for example, is a bacterial disease, caused by the "*Yersinia pestis*" bacteria, that is described as a pandemic.[21] Cholera, the world's "longest running pandemic" is another bacterial disease, caused by eating or drinking food or water contaminated with the "*Vibrio cholerae*" bacteria."[22] First and foremost, the plain language of the Policy unquestionably excludes coverage for damages caused by both viral and bacterial pandemics. The Pollution Exclusions preclude coverage for damages caused by contamination, which undoubtedly includes bacterial pandemics. *See Epic Hotel, LLC*, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (applying pollution exclusion to bar coverage for claims arising from Legionnaire bacteria). Likewise, the Policy's Microorganism Exclusion explicitly excludes coverage for all claims arising from or relating to "microorganisms." (Policy, Exhibit A, Form LMA 5018).

The Policy includes exclusions that preclude coverage for pandemics. Therefore, based on the allegations of the Complaint and the plain language of the Policy on which the action is based, Plaintiff is not a member of the class it defined. As a result, this Court need not wait until the class certification stage to determine that the class allegations in Plaintiff's Complaint are deficient.

### 3.    Plaintiff Cannot Satisfy Rule 23(b)(3) as a Matter of Law

---

[20]    *Pandemic*, MERRIAM-WEBSTER (last accessed May 8, 2020), https://www.merriam-webster.com/dictionary/pandemic.

[21]    *Plague*, CENTER FOR DISEASE CONTROL (last visited May 8, 2020), https://www.cdc.gov/plague/faq/index.html#what; *see Black Death*, ENCYCLOPEDIA BRITANNICA (April 15, 2020), https://www.britannica.com/event/Black-Death ("Black Death, pandemic that ravaged Europe between 1347 and 1351 . . . .").

[22]    *See Cholera*, WORLD HEALTH ORG. (last visited May 8, 2020), https://www.who.int/health-topics/cholera#tab=tab_1; *Cholera: The Forgotten Pandemic*, WORLD HEALTH ORG. (October 22, 2018), https://www.who.int/cholera/the-forgotten-pandemic/en/.

Rule 23(b)(3) allows for class certification where the requirements of Rule 23(a) have been satisfied and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690, 698 (S.D. Fla. 2001) (quoting Fed. R. Civ. P. 23(b)(3)). The predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). To determine whether common issues predominate, the Court must "examine the cause of action asserted in the complaint." *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000) (internal citations and quotations omitted). "The predominance inquiry focuses on 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and is 'far more demanding' than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (quoting *Amchem Prod., Inc.*, 521 U.S. at 623-24); *see also Powers v. Gov't Employees Ins. Co.*, 192 F.R.D. 313, 318 (S.D. Fla. 1998).

Plaintiff asserts causes of action, on behalf of itself and others "similarly situated," for breach of the Policy and seeks a declaratory judgment that their alleged losses are covered under the Policy. This will necessarily require the Court to adjudicate these claims under the laws of several states. "Variations in the law applicable to multistate class actions may implicate both predominance and manageability concerns." *James D. Hinson Elec. Contracting Co. v. AT & T Servs., Inc.*, No. 3:13-cv-29-J-32JRK, 2014 WL 1118015, at *4 (M.D. Fla. Mar. 20, 2014). In a federal diversity action, a federal court must apply the choice-of-law rules of the forum state. *See*

34

*LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir.1997). As this is a contract interpretation dispute, Florida's choice-of-law rule applies. *See id.* Florida courts "have long adhered to the rule of lex loxi contractus." *State Farm Mut. Auto. Ins. Co. v. Roach,* 945 So. 2d 1160, 1163 (Fla. 2006). Thus, under Florida law, "[i]t is well established . . . that matters bearing on execution, validity, interpretation and obligations of contracts are determined by the law of the place where the contract is made." *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690, 700 (S.D. Fla. 2001). The determination of where a contract is made "is fact intensive" and "requires a determination of where the last act necessary to complete the contact [w]as done." *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092-93 (11th Cir. 2004) (quoting *Pastor v. Union Cent. Life Ins. Co.*, 184 F. Supp.2d 1301, 1305 (S.D. Fla. 2002).

Therefore, to determine the law governing each policy, this Court will have to perform a fact-intensive analysis for every policy issued to every putative class member to determine where the last act necessary to complete the contract was done. That inquiry will be individualized.  From there, each proposed class member will be subject to different state, county, and local orders related to COVID-19.  Even within the same city block, those orders will apply differently to businesses of different types, i.e. essential versus non-essential business.  Once these infinite variations are applied, the Court will then have the unenviable task of wading through all the variations in state law to make 50 *Erie* guesses, not counting U.S. territories, where Underwriters subscribed to risks.[23]

---

[23] Even under Plaintiff's proposed Florida Sub-Class, the Court will need to make these fact-intensive determinations and apply the law of numerous different states. This is because the Plaintiff's Sub-Class is limited to "entities who have entered into . . . insurance policies with Lloyd's to insure property in Florida," as opposed to policies that have been "made" in Florida. (Doc. 1, ¶ 53). Thus, this Sub-Class could include policies made in many different states, issued to non-Floridian policyholders, that insure Florida property. These policies likely would not apply Florida law and the predominance issues remain.

This Court's decision in *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690 (S.D. Fla. 2001) is instructive on this point. In *Hammett*, the plaintiffs sought to bring a class action suit against credit insurers and asserted a claim for breach of contract. *Id.* at 700. This Court found that the plaintiffs failed to establish predominance, in part, because "[c]onsidering adjudication of Plaintiff's breach of contract claim will require consideration of the laws of many states." *Id.* at 701. Similarly, here, Plaintiff's breach of contract claims will require consideration of the law of many states. In other words, common questions of law and fact among class members do not predominate, and thus, Plaintiff's Complaint does not satisfy Rule 23(b)'s predominance inquiry.

### G.     COUNTS II, IV, AND VI FAIL TO ALLEGE UNDERWRITERS HAVE BREACHED THE POLICY

Plaintiff has not stated valid claims for breach of contract. To sufficiently plead a claim for breach of contract under Florida law, a plaintiff "must assert the existence of a contract, a breach of such contract, and damages resulting from such breach." *Cruz v. Underwriters at Lloyd's London*, No. 8:14-CV-1539-T-33TBM, 2014 WL 3809179, at *2 (M.D. Fla. Aug. 1, 2014). While Plaintiff's 111-paragraph Complaint sets forth an expansive background facts section, it fails to allege specific facts supporting its claims of breach in Counts II, IV, and VI.

Plaintiff alleges that "[b]y denying coverage" Underwriters have "breached their coverage obligations under the Policies" and conclusory alleges that its alleged losses trigger the Policy's business income, civil authority, and extra expense coverages. (Doc. 1 ¶ 80, 95, 110). However, Plaintiff fails to include necessary factual information to support these claims. These allegations are wholly conclusory and must, therefore, be dismissed. *See Whitney Nat. Bank v. SDC Communities, Inc.*, No. 809CV01788EAKTBM, 2010 WL 1270264, at *3 (M.D. Fla. Apr. 1, 2010) (dismissing claims for breach of contract because plaintiff failed to allege sufficient factual

information to support its claims*); Davidson v. Georgia*, 622 F.2d 895, 897 (11th Cir. 1980) ("When the allegations contained in a complaint are wholly conclusory ... and fail to set forth facts which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim."); *see also Timber Pines Plaza*, 2016 WL 8943313, at *2 ("To be clear, it is not sufficient under *Iqbal* to merely plead that the Defendant breached the Policy by failing to pay the benefits owed under the Policy.").

Moreover, even if Plaintiff's allegations are considered true, Underwriters have not breached the Policy because there is no coverage for Plaintiff's Claim. Accordingly, Plaintiff has failed to sufficiently plead that that coverage is provided by the Policy, as the express language of the Policy expressly contradicts Plaintiff's allegations that its losses are covered under the Policy. *See Cruz,* 2014 WL 3809179, at *4 (finding that plaintiff failed to sufficiently plead that its loss was covered under a policy, since the express language of an exclusion contradicted plaintiff's allegations that its claim was covered).

Accordingly Counts II, IV and VI for breach of contract must be dismissed.

## IV.  CONCLUSION

Plaintiff has failed to satisfy its burden to plead facts that would give rise to a covered claim or demonstrate that a case or controversy exists. Additionally, Plaintiff cannot allege facts that sufficiently demonstrate it has suffered a direct physical loss of or damage to its Property. Even if Plaintiff could allege a covered cause of loss, its claims are unambiguously excluded under the Policy. Because Plaintiff cannot plead a covered cause of loss under the Policy, it cannot assert its breach of contract actions. Finally, it is apparent on the face of Plaintiff's Complaint that it cannot meet the requirements for class certification.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012 | MIAMI, FL 33156 | T: 786-870-5600 | F: 855-802-5821

Thus, for the foregoing reasons, Underwriters respectfully request the Court dismiss Plaintiff's Complaint.

## **CERTIFICATE OF SERVICE**

I HEREBY CERITFY that the foregoing has been filed this **29th** day of June, 2020, using the Court's CM/ECF filing system and served via email to: **Michael Joseph Sacks, Esq.** 7210 Wisteria Avenue, Parkland, Florida 33076, msacks@bellsouth.net, **Paul Jeffrey Geller, Esq.**, Robbins Geller Rudman & Dowd, LLP, 120 East Palmetto Road, Suite 500, Boca Raton, Florida 33432, pgeller@rgrdlaw.com, **Christopher A. Seeger, Esq. and Stephen A. Weiss, Esq.** Seeger Weiss, LLP, 55 Challenger Road, 6th Floor, Ridgefield, Park, NJ 07660, cseeger@seegerweiss.com, **James E. Cecchi, Esq., Lindsey H. Taylor, Esq.,** Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., 5 Becker Farm Road, Roseland, NY 07068-1739, jcecchi@carellabyrne.com, ltaylor@carellabyrne.com, **Samuel H. Rudman, Esq. and Stuard Andrew Davidson, Esq.** Robbins Geller Rudman & Dowd, LLP, 58 S Service Road, Suite 200, Melville, NY 11747, srudman@csgrr.com, sdavidson@rgrdlaw.com.

FIELDS HOWELL LLP
Attorneys for Defendants, Underwriters
9155 So. Dadeland Blvd.
Suite 1012
Miami, FL 33156
Tel:  (786) 870-5600
Fax: (855) 802-5821

By:*/s/ Armando P. Rubio*
    Armando P. Rubio, Esq.
    Florida Bar No. 478539
    arubio@fieldshowell.com
    service@fieldshowell.com