# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 03, 2022

Clerk - Middle District of Florida
U.S. District Court
401 W CENTRAL BLVD
ORLANDO, FL 32801

Clerk - Northern District of Florida
U.S. District Court
30 W GOVERNMENT ST
PANAMA CITY, FL 32601

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  20-14812-GG   ; 21-10190 -GG   ; 21-10490 -GG
Case Style: SA Palm Beach, LLC v. Certain Underwriters at Lloyd, et al
District Court Docket No: 9:20-cv-80677-UU

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 20-14812

————————————

SA PALM BEACH, LLC,
on behalf of itself and all others similarly situated,

Plaintiff-Appellant,

*versus*

CERTAIN UNDERWRITERS AT LLOYD'S LONDON,
UNDERWRITERS AT LLOYDSLONDON KNOWN AS
SYNDICATES CNP 4444, AFB 2623, AFB 623,
BRT, 2987, BRT 2988, NEO 2468, SAM 727,
AXS1686, XIS H4202, QBE 1886, DUW 1729,
WBC 5886, CHN 2015, HDU 382, MSP 318, AGR,

Defendants-Appellees.

2                                                            20-14812

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:20-cv-80677-UU

————————————

————————————

No. 21-10190

————————————

EMERALD COAST RESTAURANTS, INC.,

Plaintiff-Appellant,

*versus*

ASPEN SPECIALTY INSURANCE COMPANY,

Defendant-Appellee.

————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:20-cv-05898-TKW-HTC

————————————

20-14812                    Opinion of the Court                         3

—————————————

No. 21-10490

—————————————

R.T.G. FURNITURE CORP.,

Plaintiff-Appellant,

*versus*

ASPEN SPECIALTY INSURANCE COMPANY,
CRUM & FORSTER SPECIALTY INSURANCE COMPANY,
EVANSTON INSURANCE COMPANY,
EVEREST INDEMNITY INSURANCE COMPANY,
HALLMARK SPECIALTY INSURANCE COMPANY, et al.,

Defendants-Appellees.

—————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-02323-JSM-AEP

—————————————

4                                                      20-14812

———————————————

No. 21-10672

———————————————

ROCOCO STEAK, LLC,
d.b.a. Rococo Steak,

Plaintiff-Appellant,

*versus*

ASPEN SPECIALTY INSURANCE COMPANY,

Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-02481-VMC-SPF

———————————————

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion is-
sued on this date in this appeal is entered as the judgment of this
Court.

Entered: May 5, 2022

For the Court: DAVID J. SMITH, Clerk of Court

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14812

_____

SA PALM BEACH, LLC,

on behalf of itself and all others similarly situated,

                                        Plaintiff-Appellant,

*versus*

CERTAIN UNDERWRITERS AT LLOYD'S LONDON,

UNDERWRITERS AT LLOYDSLONDON KNOWN AS

SYNDICATES CNP 4444, AFB 2623, AFB 623,

BRT, 2987, BRT 2988, NEO 2468, SAM 727,

AXS1686, XIS H4202, QBE 1886, DUW 1729,

WBC 5886, CHN 2015, HDU 382, MSP 318, AGR,

                                        Defendants-Appellees.

2                    Opinion of the Court                    20-14812

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:20-cv-80677-UU

————————————————

————————————————

No. 21-10190

————————————————

EMERALD COAST RESTAURANTS, INC.,

Plaintiff-Appellant,

*versus*

ASPEN SPECIALTY INSURANCE COMPANY,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:20-cv-05898-TKW-HTC

————————————————

20-14812                 Opinion of the Court                    3

_____

No. 21-10490

_____

R.T.G. FURNITURE CORP.,

                                               Plaintiff-Appellant,

*versus*

ASPEN SPECIALTY INSURANCE COMPANY,
CRUM & FORSTER SPECIALTY INSURANCE COMPANY,
EVANSTON INSURANCE COMPANY,
EVEREST INDEMNITY INSURANCE COMPANY,
HALLMARK SPECIALTY INSURANCE COMPANY, et al.,

                                               Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-02323-JSM-AEP

_____

4                    Opinion of the Court                  20-14812

_____

No. 21-10672

_____

ROCOCO STEAK, LLC,
d.b.a. Rococo Steak,

Plaintiff-Appellant,

*versus*

ASPEN SPECIALTY INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-02481-VMC-SPF

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN and ANDERSON,
Circuit Judges.

JORDAN, Circuit Judge:

These cases—which we've consolidated for decision follow-
ing oral argument—present a common question of insurance

coverage prompted by the COVID-19 pandemic.  The question is whether, under Florida law, all-risk commercial insurance policies providing coverage for "direct physical loss of or damage to" property or "direct physical loss or damage to" property insure against losses and expenses incurred by businesses as a result of COVID-19.

The Florida Supreme Court has not addressed the matter. Nor have the Florida intermediate appellate courts.  So our analytic endeavor, though informed, is necessarily predictive.  Sitting, "in effect, . . . as a state court[,]" *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967), we follow the majority view and hold that under Florida law there is no coverage because COVID-19 did not cause a tangible alteration of the insured properties.

## I

In March of 2020, in response to the public health crisis caused by the spread of COVID-19, Florida's Governor issued a series of executive orders restricting on-premises operations of non-essential businesses, including restaurants, bars, and retail stores. Several counties in Florida issued their own emergency stay-at-home or shelter-in-place orders, echoing the restrictions implemented by the Governor.  These orders immediately impacted businesses throughout the state; many were forced to close their doors, and some never reopened.

All over the country, affected businesses submitted claims under their all-risk insurance policies with the hope of recovering

some of the losses and expenses caused by the COVID-19 pandemic.  When the majority of these claims were rejected, a wave of lawsuits ensued in the state and federal courts.  The insureds here—SA Palm Beach, LLC, Emerald Coast Restaurants, Inc., Rococo Steak, LLC, and R.T.G. Furniture, Corporation—are among the Florida businesses denied coverage.

Each of the insureds seeks coverage under an all-risk insurance policy that provides compensation for losses and expenses incurred in connection with "direct physical loss of or damage to" the covered property or "direct physical loss or damage to" the covered property.  Before getting to the merits of the appeals, we set out the particulars of the underlying actions and the coverage provisions at issue on appeal.[1]

## A

SA Palm Beach operated a fine-dining restaurant in Palm Beach, Florida.  *See* SA Palm Beach Amended Complaint at ¶ 16.  Like many other similar establishments, it was subject to state and local closure orders. *See id.* at ¶ 34.

Certain Underwriters at Lloyd's, London, issued a commercial property insurance policy to SA Palm Beach.  The policy provides in relevant part that Lloyd's will "pay for *direct physical loss*

---

[1] We do not summarize or discuss policy provisions not raised by the insureds on appeal.  And because we hold that the Florida Supreme Court would deny coverage under the allegations in the complaints before us, we do not reach the exclusions cited by the insurers.

*of or damage to* Covered Property . . . caused by or resulting from any Covered Cause of Loss." *See* SA Palm Beach Policy, D.E. 24-1, at 46 (emphasis added).  As relevant here, the policy defines "Covered Causes of Loss" as "*direct physical loss* unless the loss is excluded or limited in this policy," *id.* at 36 (emphasis added), but it does not define the terms "direct," "physical," "loss," or "damage."

In its complaint, SA Palm Beach asserted that its policy provides "business interruption coverage" which "would indemnify [it] for lost income and profits in the event that its business was shut down." *See* SA Palm Beach Amended Complaint at ¶ 37.  Specifically, SA Palm Beach invoked coverage under the Business Income and Extra Expense provisions of the policy.  The relevant language of those provisions is as follows.

> **Business Income**: "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' The 'suspension' must be caused by *direct physical loss of or damage to* property at [the insured] premises[.]"

> **Extra Expense:** "Extra Expense means necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no *direct physical loss or damage to property* caused by or resulting from a Covered Cause of Loss."

SA Palm Beach Policy at 60 (emphases added).

8                     Opinion of the Court                  20-14812

The policy defines "suspension" as "[t]he slowdown or cessation of your business activities" or "[t]hat a part or all of the [insured] premises is rendered untenantable[.]"  *See id.* at 70.  The "period of restoration" is defined as the period of time that:

> a. Begins:
>
> (1) 72 hours after the time of *direct physical loss or damage* for Business Income coverage; or
>
> (2) Immediately after the time of *direct physical loss or damage* for Extra Expense coverage;
>
> caused by or resulting from any Covered Cause of Loss at the [insured] premises; and
>
> b. Ends on the earlier of:
>
> (1) The date when the property at the [insured] premises should be *repaired, rebuilt or replaced* with reasonable speed and similar quality; or
>
> (2) The date when business is resumed at a *new* permanent location.

*Id.* at 68 (emphases added).

SA Palm Beach alleged that—in abiding by the closure orders—it suffered "a direct physical loss of [its] property because [it was] unable to use the[ ] property for its intended purpose." SA Palm Beach Amended Complaint at ¶ 44.  It further claimed that it suffered direct physical loss "in the form of diminished value,

lost business income, and forced physical alterations during a pe-
riod of restoration." *Id.* at ¶ 45. Notably, SA Palm Beach main-
tained that the closure orders were "the sole proximate cause" of
its losses and disclaimed any argument that "the virus itself caused
damage to [its] . . . property." *Id.* at ¶ 54.

Lloyd's moved for dismissal under Rule 12(b)(6), asserting
that SA Palm Beach had failed to sufficiently allege direct physical
loss of or damage to the insured property, a necessary predicate for
coverage under the Business Income and Extra Expenses provi-
sions of the policy. Additionally, Lloyd's argued that the words
"repair[ ], rebuil[d], and replace[ ]" in the definition of "period of
restoration" mean that "loss" under the policy necessarily implies
physical damage.

SA Palm Beach responded that it had plausibly alleged direct
physical loss because the closure orders "rendered the property
non-functional or only partially functional as it was no longer suit-
able for its intended purpose of 'physical' sit-down, fine dining." It
also asserted that the policy's use of the disjunctive "or"—rather
than a conjunctive connector—in the phrase "direct physical loss
of *or* damage to" demonstrated that loss must mean something dif-
ferent than damage.

The district court granted the motion to dismiss. Relying in
part on our unpublished decision in *Mama Jo's Inc. v. Sparta Insur-
ance Co.*, 823 F. App'x 868, 879 (11th Cir. 2020) (holding that under
Florida law "an item or structure that merely needs to be cleaned
has not suffered a 'loss' which is both 'direct' and 'physical'"), the

court concluded that SA Palm Beach had failed to allege that its property suffered a loss that was direct and physical, as required to trigger coverage under the Business Income and Extra Expense provisions. The court also agreed with Lloyd's that the language used to define the "period of restoration" indicated that loss of functionality and ensuing economic harm are not the kind of actual damage contemplated in the relevant provisions. The court therefore ruled that SA Palm Beach's allegations were insufficient to establish coverage under the policy.

## B

Emerald Coast operated a sports bar and restaurant in Destin, Florida. *See* Emerald Coast Amended Complaint at ¶ 15. Like SA Palm Beach, it was subject to state and local closure orders issued during the COVID-19 pandemic. *See id.* at ¶¶ 65–72.

Aspen Specialty Insurance issued a commercial property insurance policy to Emerald Coast, and this policy includes Business Income, Extra Expense, and Extended Business Income provisions. The Business Income and Extra Expense provisions in Emerald Coast's policy are identical to those in SA Palm Beach's policy, so we do not repeat their language here. In summary, however, these two provisions provide coverage for the necessary suspension of operations during the "period of restoration" if the suspension is caused by "*direct physical loss of or damage to*" property at the insured premises. *See* Emerald Coast Policy, D.E. 7-1, at 60 (emphasis added). The policy also contains an Extended Business Income provision, which reads as follows:

> **Extended Business Income:** "If the necessary 'suspension' of your 'operations' produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that: (a) Begins on the date property . . . is *actually repaired, rebuilt or replaced* and 'operations' are resumed; and (b) Ends on the earlier of: (i) The date you could restore your 'operations', with reasonable speed, to the level which would generate the business income amount that would have existed if no *direct physical loss or damage* had occurred; or (ii) 60 consecutive days after the date determined in . . . (a) above. . . . Loss of Business Income must be caused by *direct physical loss or damage* at the [insured] premises caused by or resulting from any Covered Cause of Loss."

*Id.* at 62 (emphases added).  The policy does not define the phrases "direct physical loss of or damage to" property or "direct physical loss or damage."

Finally, the policy provides additional coverage—outlined in a special form—for losses associated with spoilage.   The Spoilage provision insures against "Covered Causes of Loss" of "perishable stock at the [insured] premises . . . that is in [the insured's] care, custody or control."  The "Covered Causes of Loss" include:

> (a) Breakdown or Contamination by: (1) Change in temperature or humidity resulting from mechanical breakdown or failure of refrigerating, cooling

> or humidity control apparatus or equipment . . . ;
> and (2) Contamination by the refrigerant.
>
> (b) Power Outage, meaning a change in temperature
> or humidity resulting from complete or partial in-
> terruption of electrical power . . . due to condi-
> tions beyond [the insured's] control."

*Id.* at 9–10.

Emerald Coast alleged that the "presence of any COVID-19 particles on physical property impair[ed] its value, usefulness and/or normal function." Emerald Coast Amended Complaint at ¶ 56. It tied the alleged "direct physical loss" to the closure orders, noting that they "prohibited access to and use of" the property "in response to dangerous physical conditions" caused by COVID-19. *See id.* at ¶ 82.

Aspen filed a Rule 12(b)(6) motion to dismiss, arguing that Emerald Coast had failed to allege that it sustained losses as a result of direct physical loss or damage to the insured property. Emerald Coast, said Aspen, had only alleged lost income due to the COVID-19 pandemic and the resulting government closure orders, which temporarily prevented it from using its property as it was intended. According to Aspen, the policy provisions require more than temporary loss of use; the phrase "direct physical loss of or damage to" requires "some discernible tangible impact to the covered property."

In response, Emerald Coast asserted that nothing in the policy requires physical "alteration" of the property as a prerequisite for coverage.  Like SA Palm Beach, Emerald Coast argued that the policy's use of the disjunctive "or" in the coverage provision indicates that "physical loss" is something separate and apart from "physical damage"—either of which would satisfy the policy.

The district court agreed with Aspen and granted its motion to dismiss.  It held that the triggering language in the Business Income, Extra Expense, and Extended Business Income provisions "clearly and unambiguously require[d] actual physical damage to the property."[2]

## C

Rococo Steak, LLC, operated a steakhouse in St. Petersburg, Florida.  *See* Rococo Complaint at ¶ 1.  It too was subject to state and local closure orders issued as a result of the COVID-19 pandemic.  *See id.* at ¶¶ 40–42.[3]

Aspen Specialty Insurance issued a commercial property insurance policy to Rococo.  The policy contains Business Income and Extra Expense provisions, which are identical to those in the

---

[2] As we discuss in Part IV, the district court did not consider whether Emerald Coast sufficiently alleged coverage under the Spoilage provision of the policy.

[3] Because the complaint was originally filed in state court, some of Rococo's filings were combined as an attachment to Aspen's notice of removal.  *See* D.E. 1-2 (including both Rococo's complaint and the insurance policy).

14                    Opinion of the Court                    20-14812

policies issued to SA Palm Beach (by Lloyd's) and to Emerald Coast
(by Aspen), so we don't repeat their language here.  As a reminder,
however, both provisions insure against the necessary suspension
of operations during the "period of restoration" if caused by "*direct
physical loss of or damage* to" property at the insured premises.
*See* Rococo Policy, D.E. 1-2, at 90–91 (emphasis added).  The Ro-
coco policy does not define the terms "direct," "physical," "loss,"
or "damage."

In its complaint, Rococo alleged that it was "forced to sus-
pend business operations . . . as a result of *damage sustained* due to
the COVID-19 pandemic."  *See* Rococo Complaint at ¶ 9 (emphasis
added).  Specifically, Rococo claimed that:

> The presence of COVID-19 caused *direct physical loss
> of and/or damage to the covered premises* under the
> Policy by, among other things, *damaging the prop-
> erty, denying access to the property*, preventing cus-
> tomers from physically occupying the property, caus-
> ing the property to be physically uninhabitable by
> customers, *causing its function to be nearly elimi-
> nated or destroyed*, and/or causing a suspension of
> business operations on the premises.

*Id.* at ¶ 44 (emphases added).  Rococo further asserted that
"[r]elated actions of civil authorities also prohibited access to and
occupancy/operation of the Restaurant, as a result of *damage sus-
tained* due to the COVID-19 pandemic."  *Id.* at ¶ 9 (emphasis
added).  Rococo added that the actions taken by civil authorities

"were issued in response to dangerous physical conditions and damage" and "caused a suspension of business operations" at the restaurant. *Id.* at ¶ 45.

Aspen moved to dismiss under Rule 12(b)(6), arguing that Rococo had failed to allege any losses covered under the policy. It relied on state court decisions interpreting the relevant trigger language. It also pointed to other language in the policy, like the Period of Restoration provision, which it argued implied the necessity of tangible harm for coverage.

In response, Rococo argued that it had sufficiently alleged "direct physical loss of or damage to" the premises caused by COVID-19 because, contrary to Aspen's contention, that phrase does not require structural alteration of the premises. Rococo also asserted in the alternative that viruses like COVID-19 "infest property and stick to its surfaces" and such infestation does cause the kind of structural alteration that comes within the purview of the term "direct physical loss of or damage to" the covered premises. Finally, Rococo maintained that the impairment of functionality and habitability of the restaurant demonstrated that the property had sustained direct physical loss or damage.

The district court granted Aspen's motion to dismiss. Citing our decision in *Mama Jo's*, 823 F. App'x at 879, it held that Rococo failed to allege the kind of tangible damage required to provide coverage for "direct physical loss of or damage to" property. The court likened COVID-19, which was at the heart of Rococo's claims, to the dust and debris in *Mama Jo's* and quoted that decision for the

proposition that "under Florida law, an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'" *Id.*

### D

Rooms-To-Go ("RTG") is a furniture retailer operating more than 150 stores in several states. Its principal place of business is in Seffner, Florida. *See* RTG Complaint at ¶ 2, 7. RTG, like many businesses, was subject to state and local closure orders and sustained financial losses during the COVID-19 pandemic. *See id.* at ¶ 42–50.

Given the nature of its operations, RTG secured 14 commercial property insurance policies in the form of an insurance tower, which spreads the risk across multiple insurers. The insurers included Aspen Specialty Insurance, Crum & Forster Specialty Insurance, Evanston Insurance, Everest Indemnity Insurance, Hallmark Specialty Insurance, Homeland Insurance, Maxum Indemnity, and Ironshore Specialty Insurance. The relevant terms in each of the policies RTG obtained are substantively the same.

All of the policies contain Business Interruption, Extra Expense, Contingent Business Interruption, Civil Authority, Ingress/Egress, and Loss Adjustment Expenses provisions. *See id.* at ¶ 68. With the exception of the Loss Adjustment Expenses provision, all of these provisions refer to the "Perils Insured Against" clause in the policy to determine whether coverage exists. *See* RTG

20-14812                Opinion of the Court                17

Policy, D.E. 1-1, at 16–17, 20–21.  The "Perils Insured Against"
clause states:

> This policy Insures against all risks of *direct physical
> loss of or damage to property* described herein includ-
> ing general average, salvage, and all other charges on
> shipments covered hereunder; except as hereafter ex-
> cluded.

*Id.* at 24 (emphasis added).

> The Loss Adjustment Expenses provision reads:

> This policy is extended to include expenses incurred
> by the Insured, or by the Insured's representatives for
> preparing and certifying details of a claim *resulting
> from a loss which would be payable under this policy*.
> These expenses include fees of professionals engaged
> to assist the Insured in determining the cause and
> origin of the loss, the amount of loss sustained, and
> the amount of loss payable under this policy. This pol-
> icy shall not cover the expenses of a public adjuster
> and cost of attorneys.

*Id.* at 31 (emphasis added).  RTG does not contend that this provi-
sion—though missing the exact triggering language included in the
other provisions—should be analyzed under a different frame-
work.  The common interpretative fight, RTG seems to contend,
is over what constitutes a "direct physical loss of or damage to"
property.

18                        Opinion of the Court                        20-14812

Like SA Palm Beach, Emerald Coast, and Rococo, RTG alleged that the COVID-19 closure orders prohibited access to its properties, causing its stores to lose their use and normal function. *See* RTG Complaint at ¶¶ 45–50.  RTG claimed that its inability to use or access its properties constituted direct physical loss under the policy.  *See id.* at ¶ 45.

In addition to alleging loss of use, RTG also asserted that COVID-19 itself damaged its properties.  Though it did not articulate a "damage theory" in its complaint, RTG alleged—in contrast to its assertion that the closure orders constituted a covered peril under the policies—that the "presence of coronavirus particles" which were "detectable on various types of surfaces" caused "direct physical damage" to its properties. *See id.* at ¶ 30, 33.

Invoking Rule 12(b)(6), RTG's insurers filed a motion to dismiss.  They argued that RTG had only asserted legal conclusions and failed to plead facts that would constitute direct physical loss or damage under the policies.

RTG responded that the closure orders did in fact cause a loss of use of the property within the meaning of the coverage provisions.  It also noted that it had expressly alleged the presence of COVID-19 on its properties, which would constitute direct physical loss of or damage triggering coverage under the policy.

The district court was unpersuaded by RTG's arguments and granted the insurers' motion to dismiss.  Adopting much of the reasoning of *Infinity Exhibits, Inc. v. Certain Underwriters at*

*Lloyd's London Known as Syndicate PEM 4000*, 489 F. Supp. 3d 1303 (M.D. Fla. 2020), the court concluded that economic losses associated with RTG's shutdown due to COVID-19 closure orders did not constitute "physical loss" under Florida law.  With regard to RTG's allegation that the properties were damaged by the virus itself, the court concluded—based in part on "common sense"— that "COVID-19 is incapable of causing a tangible injury to property" because it is a "virus that harms people, not structures."

## II

In these cases, which are premised on diversity jurisdiction, we must decide whether the district courts correctly forecast and applied Florida law in dismissing the insureds' complaints.  Our review is therefore plenary.  *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("[A] court of appeals should review *de novo* a district court's determination of state law."); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255 (11th Cir. 2015) ("We review the district court's dismissal of [the] amended complaint under Rule 12(b)(6) *de novo*[.]").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A claim is facially plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The plausibility standard, however, "is not akin to a 'probability requirement.'" *Id.* (citation omitted).

## III

Under Florida law, an insurance policy should be read "as a whole, endeavoring to give every provision its full meaning and operative effect." *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007) (citation omitted). If the relevant language is plain and unambiguous, it is interpreted as written. *See State Farm Mut. Auto. Ins. Co. v. Menendez*, 70 So. 3d 566, 569–70 (Fla. 2011). But if there is an ambiguity, it is construed against the insurer and in favor of coverage. *See J.S.U.B.,* 979 So. 2d at 877.

Language is not ambiguous merely because the policy fails to define a term, or because the parties disagree about its meaning. *See Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 166 (Fla. 2003). A policy is ambiguous only when "its terms make the contract susceptible to different reasonable interpretations, one resulting in coverage and one resulting in exclusion." *Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174–75 (11th Cir. 1985) (applying Florida law).

As the Florida Supreme Court has explained, an "all-risk policy" does not extend coverage to "every conceivable loss." *Sebo v. Am. Home Assurance Co., Inc.*, 208 So. 3d 694, 696–97 (Fla. 2016) (citation omitted). As a result, "[a]n insured claiming under an all-risk[ ] policy has the burden of proving that the insured property suffered a loss while the policy was in effect." *Empire Pro Restoration, Inc. v. Citizens Prop. Ins. Corp.*, 322 So. 3d 96, 98 (Fla. 4th DCA 2021) (internal quotation marks and citation omitted). *See generally* Andrew B. Downs & Linda M. Bolduan, 4 Law and Prac.

20-14812              Opinion of the Court                    21

of Ins. Coverage Litig. § 52:4 (2021) (explaining that under all-risk policies "all direct physical losses not excluded are covered").

## A

SA Palm Beach, Emerald Coast, and Rococo seek coverage under the Business Income and Extra Expense provisions of their respective policies. Emerald Coast additionally seeks coverage under the Extended Business Income provision of its policy. RTG seeks coverage under the Business Interruption, Extra Expense, Contingent Business Interruption, Civil Authority, Ingress/Egress, and Loss Adjustment Expenses provisions of its policy.

All but one of the provisions referenced above expressly require (on their own or by reference to other policy provisions) that there be "direct physical loss of or damage to" property or "direct physical loss or damage" to property. The one exception is the Loss Adjustment Expenses provision of RTG's policy. But because RTG does not present any distinct arguments about that provision, we consider it together with the other provisions in its policy.

There are no Florida decisions interpreting an all-risk commercial insurance policy providing coverage for "direct physical loss of or damage to" property or "direct physical loss or damage to" property in the context of the COVID-19 pandemic. We have

not located any such decisions and the parties have not pointed us to any.[4]

We therefore "consider whatever might lend [us] insight, including relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the [Florida Supreme Court] would decide the issue at hand." *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005) (internal quotation marks and citation omitted). For the reasons which follow,

---

[4] A Westlaw search yielded a number of Florida cases involving insurance policies with the phrase "physical loss of or damage to." These cases, however, are not very helpful because they involved undisputed tangible harm to the property or dealt with legal issues not present here. *See King's Ridge Cmty. Ass'n, Inc. v. Sagamore Ins. Co.*, 98 So. 3d 74, 75–79 (Fla. 5th DCA 2012) (additional coverage for collapse based on deflection of trusses and drop ceiling at clubhouse); *XL Specialty Ins. Co. v. Aircraft Holdings, LLC*, 929 So. 2d 578, 579 (Fla. 1st DCA 2006) (attorney-client privilege issue); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Texpak Group N.V.*, 906 So. 2d 300, 301–02 (Fla. 3d DCA 2005) (exception to exclusion); *Gen. Star Indem. Co. v. West Fla. Village Inn, Inc.*, 874 So. 2d 26, 28–29 (Fla. 2d DCA 2004) (calculation of deductibles); *Edward J. Gerrits, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 634 So. 2d 712, 713 (Fla. 3d DCA 1994) (indemnification claim by insured); *West Am. Ins. Co. v. Chateau La Mer II Homeowners Ass'n*, Inc., 622 So. 2d 1105, 1106–08 (Fla. 1st DCA 1993) (collapsed balconies in condominium building); *C.A.B. St. George v. Harris*, 440 So. 2d 62, 63–64 (Fla. 1st DCA 1983) (damage calculation for stolen plane that was returned); *Harris v. U.S. Fid. & Guar. Co.*, 409 So. 2d 1210, 1211 (Fla 1st DCA 1982) (explosion of boat engine).

we believe that the Florida Supreme Court would hold that, under the allegations in the complaints before us, there is no coverage.

## B

Although there are many different approaches by which federal courts predict state law, *see* Michael C. Dorf, *Prediction and the Rule of Law*, 42 UCLA L. Rev. 651, 696–715 (1995), some of our cases employ a presumption to forecast how state courts would decide an unsettled issue. We "presume that [state] courts would adopt the majority view on a legal issue in the absence of indications to the contrary." *Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294, 1304 (11th Cir. 2017) (using this presumption to determine Alabama law). *See also Wammock v. Celotex Corp.*, 835 F.2d 818, 820 (11th Cir. 1988) (using this presumption to determine Georgia law); *Hensley v. E.R. Carpenter Co.*, 633 F.2d 1106, 1109 (5th Cir. Unit A 1980) (using this presumption to determine Mississippi law).[5]

The majority view, as set out in a leading insurance treatise, is that a phrase like "physical loss of or damage to" requires a tangible alteration to the covered property:

---

[5] The case relied upon by *Hensley* did not use the term "presumption," but merely noted that our view of Mississippi law was "in agreement with the general body of UCC law[.]" *United States v. Southeast Miss. Livestock Famers Ass'n*, 619 F.2d 435, 439 (5th Cir. 1980). Nevertheless, what started out as general agreement or consistency with the majority view has now become a presumption that state courts will align themselves with the majority position, absent contrary indications.

The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

Steven Plitt et al., 10A Couch on Insurance § 148:46 (3rd ed. & Dec. 2021 update) (footnotes omitted).

As far as we can tell, every federal and state appellate court that has decided the meaning of "physical loss of or damage to" property (or similar language) in the context of the COVID-19 pandemic has come to the same conclusion and held that some tangible alteration of the property is required. There is therefore no coverage for loss of use based on intangible and incorporeal harm to the property due to COVID-19 and the closure orders that were issued by state and local authorities even though the property was rendered temporarily unsuitable for its intended use. *See Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 930–34 (4th Cir. 2022) (West Virginia law); *Q Clothier New Orleans, LLC v. Twin City Fire Ins. Co.*, 29 F.4th 252, 257–61 (5th Cir. 2022) (Louisiana law); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 455–59 (5th Cir. 2022) (Texas law); *Brown Jug, Inc. v. Cincinnati Ins. Co.*, 27 F.4th 398, 402–05 (6th Cir. 2022) (Michigan law); *Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 699–702 (6th Cir. 2022) (Kentucky law); *East Coast Ent. of Durham, LLC v. Houston*

*Cas. Co.*, ____ F.4th ____, 2022 WL 1086377, at \*2–\*3 (7th Cir. Apr. 12, 2022) (Illinois law); *Monday Rest. LLC v. Intrepid Ins. Co.*, ____ F.4th ____, 2022 WL 1194000, at \*1–\*2 (8th Cir. Apr. 26, 2022) (Missouri law); *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 220–23 (2d Cir. 2021) (New York law); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 400–06 (6th Cir. 2021) (Ohio law); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 334–37 (7th Cir. 2021) (Illinois law); *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 308 (7th Cir. 2021) (Illinois law); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144–45 (8th Cir. 2021) (Iowa law); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 891–93 (9th Cir. 2021) (California law); *Goodwill Indus. v. Phil. Indem. Ins. Co.*, 21 F.4th 704, 710–12 (10th Cir. 2021) (Oklahoma law); *Gilreath Fam. & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.*, 2021 WL 3870697, at \*2 (11th Cir. Aug. 31, 2021) (Georgia law); *Wakonda Club v. Selective Ins. Co. of Am.*, ____ N.W.2d ____, 2022 WL 1194012, at \*3–\*7 (Iowa Apr. 22, 2022) (Iowa law); *Verveine Corp. v. Strathmore Ins. Co.*, ____ N.E.3d ____, 2022 WL 1180061, at \*5–\*7 (Mass. Apr. 21, 2022) (Massachusetts law); *Ind. Repertory Theatre v. Cincinnati Cas. Co.*, 180 N.E.3d 403, 408–11 (Ind. Ct. App. 2022) (Indiana law); *Sweet Berry Café, Inc. v. Society Ins., Inc.*, ____ N.E.3d ____, 2022 WL 780847, at \*6–\*11 (Ill. App. Ct. Mar. 15, 2022) (Illinois law); *Gavrilides Mgmt. Co., LLC v. Mich. Ins. Co.*, ____ N.W.2d ____, 2022 WL 301555, at \*4–\*6 (Mich. Ct. App. Feb. 1, 2022) (Michigan law); *Sanzo Ent., LLC v. Erie Ins. Exch.*, 182 N.E.3d 393, 401–06 (Ohio Ct. App. 2021)

(Ohio law); *Inns-by-the-Sea v. Cal. Mut. Ins. Co.*, 71 Cal. App. 5th 688, 698–712 (4th Dist., Div. 1 2021) (California law).[6]

There are no indications suggesting that the Florida Supreme Court would reject the majority view. We therefore presume that Florida would adopt the majority position. *See Bobo*, 855 F.3d at 1304.

## C

As an independent matter, we conclude that the majority position is legally sound under Florida law. Indeed, the two Florida cases that shed some light on the phrase "physical loss of or damage to" property—*Homeowners Choice Prop. & Cas. v. Maspons*, 211

---

[6] The majority view is not unanimous, as a number of district courts and state trial courts have held that tangible injury to covered property is not necessary under policy provisions identical or similar to the ones at issue here. *See, e.g., In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 521 F. Supp. 3d 729, 738–43 (N.D. Ill. 2021) (Illinois law); *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 372–376 (E.D. Va. 2020) (Virginia law); *Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co.*, 489 F.Supp. 3d 1297, 1301–03 (M.D. Fla. 2020) (Florida law); *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800–03 (W.D. Mo. 2020) (Missouri law); *Cherokee Nation v. Lexington Ins. Co.*, 2021 WL 506271, at *3–*6 (Okla. Dist. Ct. Jan. 28, 2021) (Oklahoma law). *Accord* Mitchell F. Dolin et al., Bus. & Com. Litig. Fed. Cts. § 107:37 (5th ed. & Dec. 2021 update) ("Various courts have found that a structural change in covered property is not required. [ . . . ] Some courts have suggested that the change in property must be 'permanent' or 'structural' to qualify as 'damage.' That approach seems problematic as it would remove coverage for commonly covered non-structural damage, like graffiti or vandalism.") (footnotes omitted).

So. 3d 1067 (Fla. 3d DCA 2017), and *Azalea, Ltd. v. Am. States Ins. Co.*, 656 So. 2d 600 (Fla. 1st DCA 1995)—are consistent with the majority position (or at the very least not inconsistent with that position).

In *Maspons*, the insurer appealed a trial court order holding it responsible for the cost of tearing out and replacing a concrete slab to make a repair on a broken drain pipe in the insureds' home. *See* 211 So. 3d at 1068.  The policy insured against "risk of direct loss to property . . . only if that loss is a physical loss to property." *Id.* at 1069 (emphasis omitted).  The Third District, relying on Black's Law Dictionary, explained that "[a] 'loss' is the diminution of value of something, and in this case, the 'something' is the insureds' . . . property.  'Direct' and 'physical' modify loss and impose the requirement that the damage be actual." *Id.* at 1069 (citation omitted).[7]

Though it ultimately ruled in favor of the insurer based on other language in the policy, the Third District held in *Maspons* that the "failure of the drain pipe to perform its function

---

[7] Our own dictionary searches for the words "loss" and "damage" have yielded definitions of a kindred timbre.  "Loss" means "[p]erdition, ruin, destruction," Shorter Oxford English Dictionary 1638 (5th ed. 2002), or "[d]estruction," American Heritage Dictionary of the English Language 1034 (4th ed. 2009). "Damage" means "[h]arm done to a thing or (less usually . . . ) person: esp. physical injury impairing value or usefulness," Shorter Oxford English Dictionary at 596, or "[h]arm or injury to property or to a person, resulting in loss of value or the impairment of usefulness," American Heritage Dictionary of the English Language at 458.

constituted a 'direct' and 'physical' loss to the property within the meaning of the policy." *Id.* at 1068–69. But that failure was the result of a physical "break"—tangible harm—which would require "repair" to restore functionality. *Id.* at 1068.

Though the language in *Maspons* came from a home-owner's policy rather than a commercial insurance policy and is not identical to the language in the policies before us, it is sufficiently similar to make that case informative. *See id.* at 1068. And because *Maspons* explains that direct and physical loss requires that damage be actual, *see id.* at 1069, it does not help the insureds here. Moreover, *Maspons* involved tangible harm to the covered property, i.e., a physical break in the drain pipe, and such harm is missing here. *See also Vazquez v. Citizens Prop. Ins. Corp.*, 304 So. 3d 1280, 1284–85 (Fla. 3d DCA 2020) (applying *Maspons* in a case where water intrusion damaged some ceramic tiles and a kitchen cabinet in the insured's home).

In *Azalea*, the insured operated a mobile home park with its own sewage treatment facility on site. *See* 656 So. 2d at 600. Vandals dumped an unknown substance into the sewage treatment facility, causing the destruction of a bacteria colony that was an integral part of the sewage treatment process. *See id.* at 601. The insured then sought to recover under a provision in its commercial insurance policy for "direct physical loss of or damage to" property at the covered premises. *See id.* at 600–01.

The trial court ruled in favor of the insurer, but the First District reversed. The "bacteria colony [was] an integral part of the

sewage treatment facility" and was "specifically attached to and became part of the treatment facility structure." *Id.* at 602. As a result, there was a "tangible injury to the physical structure" because the unknown "substance actually covered and adhered to the interior of the structure *causing destruction* of the bacteria colony which was an integral part of the covered facility." *Id.* (emphasis added). The First District emphasized the amount of work that was done to restore the sewage treatment facility back to working order, including "hand chiseling . . . [the] chemical residue" from the structure. *See id.* at 601.

*Azalea*, which aligns with the majority view, also does little to help the insureds here. *See id.* That is because *Azalea*, like *Maspons*, dealt with tangible harm to the covered property, i.e., the destruction of the bacteria colony which had physically become part of the sewage treatment facility. *See id.*

Our unpublished decision in *Mama Jo's*, which involved the application of Florida law, also cuts against the insureds' argument that "direct physical loss of or damage to" property does not require actual, tangible, structural, or concrete harm to property but merely demands that the property no longer be suitable for its intended use. *See* 823 F. App'x at 878–79. In *Mama Jo's*, dust and debris from a nearby road construction project migrated into the insured's restaurant. The restaurant stayed open during the construction project, and staff performed daily cleaning, but customer traffic decreased. *See id.* at 871–72. The insured made two claims under its commercial all-risk policy—one for cleaning and painting

expenses under the Building and Personal Property Coverage provision, which covered "direct physical loss of or damage to covered property" from any covered cause of loss (including "direct physical loss"); and another under the Business Income Loss provision, which required that the "suspension" of operations be "caused by direct physical loss of or damage to" the property. *See id.* at 879.

Applying Florida law, and relying on *Maspons*, we held that the district court had correctly granted summary judgment to the insurer on both claims. *See id.* at 878–79. With respect to the cleaning and painting claim, we said that "under Florida law, an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'" *Id.* at 879 (citing *Maspons*, 211 So. 3d at 1069). As for the lost income claim, the insured did not "put forward any . . . evidence that it suffered a direct physical loss of or damage to its property during the policy period." *Id.*

We conclude that *Mama Jo's* provides a correct statement of Florida law in accord with the majority view and therefore find it persuasive. Like the dust and debris in *Mama Jo's*, COVID-19 did not cause any material alteration of the insureds' properties. *See id.* It did require that the properties be cleaned to eliminate the particles of the virus, but as *Mama Jo's* explains, that does not constitute a "physical loss of or damage to" the properties. *See id.*

## D

The Business Income, Business Interruption, and/or Extra Expense provisions of the SA Palm Beach, Emerald Coast, Rococo,

and RTG policies, and the Extended Business Income provision of the Rococo policy, all require that there be a "suspension" or "interruption" of operations and cover certain expenses and losses during the period in which the covered property is "repaired," "rebuilt," or "replaced."  *See* SA Palm Beach Policy at 68; Emerald Coast Policy at 68; Rococo Policy at 98; RTG Policy at 20.  With regards to the provisions containing such language, there is another reason why coverage does not exist for losses caused by COVID-19.

> Here's how the Fourth Circuit put it in a similar case:

> The need to repair, rebuild, replace, or expend time securing a new, permanent property is a pre-condition for coverage of lost business income and other expenses.  Any alternative meaning of the terms "physical loss" or "physical damage" that does not require a material alteration to the property would render meaningless this pre-condition to coverage for business income loss. [ . . . ] Here, neither the closure order nor the COVID-19 virus caused present or impending material destruction or material harm that physically altered the covered property requiring repairs or replacement so that they could be used as intended.  Thus, . . . the policy's coverage for business income loss and other expenses does not apply to [an insured's] claim for financial losses in the absence of any material destruction or material harm to its covered premises.

*Uncork & Create*, 27 F.4th at 932–33 (internal footnotes omitted). *See also Town Kitchen LLC v. Certain Underwriters at Lloyd's, London*, 522 F. Supp. 3d 1216, 1222 (S.D. Fla. 2021) ("[T]he key difference between the Plaintiff's loss of use theory and something clearly covered—like a hurricane—is that the property did not change.  The world around it did.  And for the property to be use-able again, no repair or change can be made to the property—the world must change.").  We find this reasoning persuasive and follow it here.

## E

RTG and Rococo also argue that their complaints alleged that COVID-19 itself actually damaged their properties.  RTG alleged that "the presence of coronavirus particles caused . . . direct physical damage" to its property.  *See* RTG Complaint at ¶ 33.  Rococo alleged more generally that the "presence of COVID-19 caused direct physical . . . damage to the covered premises" and "damage[ed] the property."  *See* Rococo Complaint at ¶ 44.  Because they affirmatively pled that COVID-19 damaged their properties, RTG and Rococo maintain that—even under the majority view—their claims should survive a motion to dismiss.

For its part, RTG did in fact assert that COVID-19 damaged its property, but it also set out more specific details concerning this general claim.  It alleged that "coronavirus particles" caused the damage, and that those particles were "detectable on various types of surfaces."  RTG Complaint at ¶ 30, 33.  These specific allegations of what the "physical damage" consisted of govern over the general

allegation that there was "physical damage."  As we have explained, taking the allegations of a "complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations[.]"  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007).

We know from *Mama Jo's*, which we find persuasive, that under Florida law "an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'"  823 F. App'x at 879.  In other words, surfaces not tangibly altered or harmed can be cleaned without requiring repair.  RTG's need to clean or disinfect stores to get rid of COVID-19 does not constitute direct physical loss or damage under Florida law.

In its brief, Rococo argues that "the particles of COVID-19 structurally alter property surfaces and ambient air in a manner that causes loss and damage by rendering affected premises dangerous to human health."  Rococo Br. at 31.  But this allegation appears nowhere in its complaint.  In fact, the complaint does not even distinguish between loss and damage, and instead generally alleges that COVID-19 "caused direct physical loss of and/or damage to the covered premises" without providing any details. *See* Rococo Complaint at ¶ 44.  A plaintiff must "provide the grounds of his entitlement to relief" in order to give the defendant fair notice of its claim, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted and alteration adopted), and here we do not think that Rococo's bare allegation that COVID-19 caused direct physical damage fulfills this obligation.

## IV

We now turn to one claim based on a policy provision which does not contain the language "direct physical loss of or damage to" property or "direct physical loss or damage to" property. That claim is the Spoilage provision claim made by Emerald Coast.

As the parties correctly note, the district court did not address this claim in its order of dismissal. We believe the best course of action is to remand the case so that the district court can decide, in the first instance, whether this claim survives Aspen's motion to dismiss. *See, e.g., F.D.I.C. v. N. Savannah Props., LLC*, 686 F.3d 1254, 1261 (11th Cir. 2012). We therefore vacate in part the dismissal of Emerald Coast's complaint and send the case back for a ruling on the claim under the Spoilage provision.

## V

We affirm the dismissal of the complaints filed by SA Palm Beach, Rococo, and RTG. We affirm in part and vacate in part the dismissal of the complaint filed by Emerald Coast, and remand that case for further proceedings consistent with this opinion.

**AFFIRMED IN CASE NOs. 20-14812, 21-10672, & 21-10490; AFFIRMED IN PART AND VACATED IN PART IN CASE NO. 21-10190.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 05, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-14812-GG   ; 21-10190 -GG   ; 21-10490 -GG   ; 21-10672 -DD
Case Style:  SA Palm Beach, LLC v. Certain Underwriters at Lloyd, et al
District Court Docket No:  9:20-cv-80677-UU

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, <u>costs taxed against appellants in 20-14812, 21-10490, and 21-10672.  75% of costs taxed against appellant in 21-10190.</u>

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call <u>Joseph Caruso, GG</u> at <u>(404) 335-6177</u>.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs